UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 3:16-cr-30033-TSH |
| RALPH SANTANIELLO, | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through, Andrew E. Lelling, United States Attorney for the District of Massachusetts, Katharine Wagner, Assistant United States Attorney, David L. Jaffe, Acting Chief of the Department of Justice Organized Crime and Gang Section and Marianne Shelvey, Trial Attorney, Department of Justice Organized Crime and Gang Section (the "Government"), hereby file the Government's Sentencing Memorandum for the defendant Giovannie Calabrese a/k/a "Johnny Cal" ("Calabrese," or the "defendant"). The government respectfully submits that the defendant warrants a Guidelines sentence of 78 months followed by three years of supervised release, a fine within the Guidelines range of $20,000 to $200,000, and entry of an order of restitution in the amount of $20,000 to be paid to the Hampden County District Attorney's Office. The Government further requests that the Court enter the proposed forfeiture orders that will be filed prior to sentencing.

I.     FACTUAL AND PROCEDURAL BACKGROUND

The Genovese crime family of La Cosa Nostra ("LCN") had been engaged in a variety of criminal activities, including loan sharking, gambling, money laundering, and extortion in the

Springfield area for decades.  The defendant was one of the most prominent Genovese associates in the Springfield area.  According to the testimony of FBI Special Agent Robert Zanolli at the detention hearing in this matter, the defendant was not yet a made man, but reported directly to Genovese capo Eugene Onofrio, who oversaw the Springfield crew from New York.

Indeed the defendant was charged with Onofrio, co-defendant in this case Frank Depergola, and more than forty additional associates in the Southern District of new York in 2016.  In that case, the defendant pleaded guilty to extending credit by financial extortion and was sentenced to 30 months in prison followed by three years of supervised release.  *See* Case No. 16-CR-522 (S.D.N.Y.).  In extortion scheme, the defendant and Depergola extended at $30,000 loan to a Genovese associate on behalf of Onofrio at an annual interest rate of 78 percent.  Detention Tr. 8/11/16, attached hereto as Exhibit A, at 86–88.  The Government respectfully requests that any custodial sentence issued in this case be consecutive to the 30-month sentence that the defendant is already serving to reflect the different victims involved in the two cases.

As Massachusetts State Police ("MSP") Captain Thomas Murphy testified at the trial of co-defendant Richard Valentini (the "Valentini trial"), the LCN criminal activity had resulted in high profile murders in Springfield in the early 2000s, and those murders served as a warning.  In November 2003, the capo in Springfield, Adolfo "Al" Bruno was assassinated outside of the Mount Carmel Society, standing next to Depergola.  Around the same time, associate and police informant Gary Westerman disappeared the same month, only to surface in 2010 buried in the backyard of an Agawam house.  Anthony Arillotta took over from Bruno until his arrest in 2010.  Arillotta turned informant and later pleaded guilty to ordering Bruno's murder.  The defendant and Arillotta were co-defendants, along with current co-defendant Valentini, in a 2005 Hampden

County Superior Court case in which the defendant was convicted of usury, possession of an apparatus for registering bets, organizing or promoting gambling facilities, and setting up or promoting an illegal lottery.  *See* Presentence Report ("PSR") ¶ 69.  The defendant's ties to organized crime in Springfield are therefore long and deep.

A.  Extortion of Victim 1

In the fall of 2013, the defendant, Valentini, Calabrese, and Depergola used threats— implied and explicit—to extort $20,000 from local businessman Victim 1.  On September 30, 2013, the defendant and Calabrese arrived unannounced at Victim 1's isolated, rural property, which was then a construction site.  They informed Victim 1 that they were the "new crew" in town and were taking over for Bruno  They demanded that Victim 1 pay them $50,000 in "arrears" for payments that Victim 1 had not made to the organization since Bruno's death in 2003 and a monthly tribute thereafter.  When Victim 1 resisted, they lowered their demand to $20,000 in arrears and $2,000 per month.  When Victim 1 still resisted, Calabrese threatened to bury him in his own woods if he (Victim 1) did not "smarten up" and pay their demand.  The defendant added that they would cut his head off first.  The defendant also "smashed" Victim 1 in the face, leaving a visible cut and abrasion.  Victim 1 agreed to pay.

But before Victim 1 paid, he went to the Massachusetts State Police ("MSP").  Using funds provided by the Hampden County District Attorney's Office, MSP and Victim 1 made multiple recordings of payments, meetings, and calls between Victim 1 and the defendant and his co-conspirators.  In those recordings, some of which the Court observed during the Valentini trial, the defendant and his co-conspirators cajoled, threatened, played up their ties to "New York" (*i.e.*, the Genovese organization), and postured to get Victim 1 to pay them.  The defendant and his co-conspirators met with Victim 1 more than a dozen times in total.  The

defendant himself met with Victim 1 six times, and often was brought in as the more threatening member of the crew when Calabrese failed to collect the money expected. Calabrese acted as the "good" guy, whereas the defendant was the violent, unpredictable one. The defendant's threatening manner was evident in the recordings viewed at the Valentini trial, including when on October 9, 2013, the defendant lunged at Victim 1 and ripped open his shirt to see whether he was wearing a wire, and on October 23, 2013, when the defendant insisted that Victim 1 "walk with me" around the corner of the East Longmeadow Starbucks. Victim 1 believed that the defendant intended to lure him to a secluded area and hit him again. In the end, by November 25, 2013, Depergola had worked out a deal with the person in charge in New York, and Victim 1 paid $20,000 to the crew.

B. Extortion of Victim 2

By the spring of 2015, the Daniele, Calabrese, and the defendant were running illegal gambling operations, making unlawful extensions of credit, and using threats of physical violence to collect on those extensions of credit.

In March 2015, Victim 2 borrowed $3,700 from Daniele. Between March and June 2015, Victim 2 paid Daniele $100 per week on this loan, which carried a 45 percent per year interest. When Victim 2 was late on a payment, Daniele went to Victim 2's place of work and threatened to "slug it out." And then Daniele called in reinforcements. He called in the defendant and Calabrese, once again working in tandem to extract money by threats and the weight of their organization.

Victim 2 paid Calabrese $200 per week until he could no longer make the payments. At that point, Calabrese told Victim 2 that he must continue making payments or "things can get nasty." Victim 2 continued to pay the defendant, this time $200 every other week—again toward

4

the juice only.  According to Special Agent Zanolli, the defendant offered to lower Victim 2's

debt if Victim 2 sold narcotics on his behalf.  Detention Tr. 8/11/16 at 79.  Calabrese also "had

suggested [to Victim 2] that he bring more betters to the table, names that they could review—

[the defendant] and Ralph could review and vet out to ensure that they were not law

enforcement.  And that way [Victim 2] could get a certain percentage or a kickback from these

bettors when they lost with them to repay his debt with them." *Id.* at 79–80.

Between July and October 2015, MSP recorded Victim 2's interactions with and

payments to the Springfield Genovese crew.  During that time, the defendant, through his

emissary Calabrese, increased the loan amount to $5,000 without explanation.  During this time

period, Victim 2 paid the crew a total of $1,400 over seven meetings because the defendant and

his co-conspirators used their association with the LCN—and the fear inherent in that

association—to induce these payments.

C.  Indictment and Plea

On July 28, 2016, a federal grand jury sitting in Springfield returned an Indictment

charging the defendant with four counts in relation to the extortion of Victim 1 and the

extortionate loan to Victim 2: conspiracy to extort and extortion, in violation of 18 U.S.C. § 1951

(Counts 1 and 2); conspiracy to use extortionate means to collect extensions of credit, in

violation of 18 U.S.C. § 894(a) (Count 5); and using extortionate means to collect extensions of

credit, in violation of 18 U.S.C. § 894(a) (Count 6).   The indictment also charged Valentini,

Depergola, and Calabrese with extortion and conspiracy to commit extortion in relation to

Victim 1, and charged Calabrese and Daniele with charges relating to Victim 2.

The defendant and Calabrese pleaded guilty to Counts 1, 2, 5, and 6 of the indictment on

November 6, 2017 pursuant to plea agreements.  *See* DE 158, 162, 164–65.  On December 5,

2017, Daniele and Depergola pleaded guilty to various charges pursuant to plea agreements.  On

A jury returned a guilty verdict on Counts 1 and 2 as to Valentini on December 18, 2017.

Depergola and Santaniello also pleaded guilty to charges in the Southern District of New York

related to their activity with the LCN organization there, as described above.  The defendant will

be the third of these defendants to be sentenced.  On March 12, 2018, Daniele received a

sentence of 24 months for the single count of extortionate collection of a loan to which he

pleaded guilty, and Calabrese is scheduled to be sentenced on the morning of April 10, 2018.

II.   DEFENDANT'S APPLICABLE SENTENCING GUIDELINES, RESTITUTION, AND FORFEITURE

The Probation Office determined that the defendant's applicable Guidelines range is 63 to

78 months based on a base offense level of 18, and enhancements for making a threat of death,

demonstrating the capacity to carry out such a threat, demanding more than $20,000 in payment,

inflicting bodily injury on Victim 1, and grouping of the offenses involving Victim 1 and Victim

2, following reductions for acceptance of responsibility, and a criminal history category of I.

Presentence Report ("PSR") ¶¶ 36–58, 104.  The Sentencing Guidelines provide for a fine in the

amount of between $20,000 and $200,000.  PSR at 31.  The Government agrees with the

Probation Office's calculation.  The defendant does not, raising two objections which will be

addressed in greater detail below.  The defendant is also subject to a period of supervised release

of not more than three years, a fine, and a mandatory $400 assessment.  PSR at 31.

The admitted statement of facts, attached hereto as Exhibit 1, establishes that Victim 2

paid approximately $3,400 to the defendant and his co-conspirators as a result of threats and

intimidation by the defendant, Daniele, and Calabrese.  Accordingly, the PSR calculates the

amount of restitution that the Court shall order paid to Victim 2—the victim of the defendant's

count of conviction—as $3,400 (presumably accounting for the $2,000 paid prior to MSP's investigation, and $1,400 in the course of MSP's investigation).  PSR ¶ 118; *see also* 18 U.S.C. § 3663A; U.S.S.G. § 5E1.1(a)(1).  However, as in the cases of Daniele and Calabrese, the Government is not seeking restitution with respect to Victim 2.  The Government is seeking restitution in the amount of $20,000 with respect to Victim 1.  However, The Hampden County District Attorney's Office—not Victim 1—provided the funds for these extortionate payments. Accordingly, the Government seeks restitution in the amount of $20,000 to the Hampden County District Attorney's Office.

Finally, the defendant agreed not to contest and to assist in the execution of any forfeiture order entered by the Court in this matter.  DE 164 ¶ 9.  Accordingly, the Government requests that the proposed Preliminary Order of Forfeiture and Order of Money Judgment to be filed on April 9, 2018 be entered and incorporated into the sentence and Judgment imposed.

III.    THE DEFENDANT'S SENTENCING OBJECTIONS SHOULD BE OVERRULED

The Probation Office found, and the government agrees, that the following enhancements apply to the defendant:

- a two-point enhancement because "the offense involved an express or implied threat of death [or] bodily injury," U.S.S.G. § 2B3.2 (b)(1);

- a one-level enhancement is applicable because the defendant and his co-conspirators demanded more than $20,000 from their victims, U.S.S.G. §§ 2B3.2(b)(2) and 2B3.1(b)(7)(B);

- a two-point enhancement because the victim sustained a "bodily injury," U.S.S.G. § 2B3.2(b)(4); and

- a three-point enhancement because the defendant and his co-conspirators

"demonstrated the ability to carry out a threat" of (I) death or (II) "serious bodily

injury," U.S.S.G. § 2B3.2 (b)(3)(B)(ii).  PSR ¶¶ 36–58, at 36–37.

The defendant does not object the first two enhancement but objects to the third and fourth,

arguing (a) that Victim 1's injuries were slight and therefore did not amount to a "bodily injury"

as defined in the Sentencing Guidelines, and (b) the death threat the defendant and his co-

conspirator made on September 30, 2013 was idle and defendant did not demonstrate a capacity

to carry out such a threat.  PSR at 36–37; DE 267 at 2–6.  For the reasons that follow, the Court

should overrule the defendant's objections and adopt the PSR's Guidelines calculation of 63 to

78 months.

A.  Victim 1 Sustained a "Bodily Injury" and U.S.S.G. § 2B3.2(b)(4) Applies to Defendant

Pursuant to U.S.S.G. § 2B3.2(b)(4), if the victim sustained a "bodily injury," the base

level offense is increased by two.  The Probation Office found, and the government agrees, that

defendant's use of physical force by striking Victim 1, constituted bodily injury.  Under the

Sentencing Guidelines, "bodily injury" is defined as "any significant injury; *e.g.*, an injury that is

painful and obvious, or is of a type for which medical attention ordinarily would be sought."

U.S.S.G. § 1B1.1, app. n. 1(B). Bodily injury is defined by the Sentencing Guidelines, but its

"open-ended [in] nature" and requires  "a very factually-specific inquiry which takes into

account a multitude of factors, some articulable and some more intangible, that are observable in

hearing the evidence presented on the injury."  *United States v. Lancaster*, 6 F.3d 208, 210 (4th

Cir. 1992).  "Injuries that are 'painful and obvious' but that do not require medical attention may

nevertheless constitute 'bodily injuries' justifying application of a sentence enhancement."

*United States v. Perkins*, 132 F.3d 1324, 1326 (10th Cir. 1997) (citing *United States v. Hamm*, 13

F.3d 1126, 1128 (7th Cir. 1994)).

8

In the present case, the defendant slapped Victim 1 when the defendant and Calabrese first approached Victim 1 at his remote property on September 30, 2013.  At co-defendant Valentini's trial, Victim 1 testified that the defendant "smashed [him] in the side of the face" and he "saw stars for a minute."  Victim 1 further stated that he had "[a] scuff and a cut on the lip." Tr. 12/15/17 at 35.  Victim 1's red abrasion and cut above his lip were still visible the following day, when MSP photographed his injuries.  Tr. Exs. 2, 3.  Victim 1's testimony and the photographs establish that Victim 1's injuries were both painful and obvious and, consequently, within the Guidelines definition of "bodily injury" warranting a two-level enhancement.

"Courts have held visible injuries such as bumps, bruises, and redness or swelling to constitute 'bodily injury'" as defined in U.S.S.G. § 1B1.1 app. n. 1(B).  *United States v. Perkins*, 132 F.3d 1324, 1326 (10th Cir. 1997) (citing *Hamm*, 13 F.3d at 1128, and *United States v. Greene*, 964 F.2d 911, 912 (9th Cir. 1992) (*per curiam*)).   Accordingly, courts have held that facial injuries similar to those Victim 1 sustained constitute "bodily injury."  *See, e.g.*, *United States v. Hight*, 695 Fed. App'x 532, 535 (11th Cir. 2017) (affirming "bodily injury" enhancement where defendant punched the victim in the mouth, which "jolted" him backwards and cased "a small cut on his lip and some swelling and bleeding in the area where he was struck"); *United States v. Tensley*, 679 Fed. App'x 227, 229–30 (3d Cir. 2017) (finding that what photographs depicted as a bloody nose and a small but inside the lower lip but otherwise "no damage" caused by a punch to the head satisfied the "bodily injury" enhancement); *United States v. Worthy*, 623 Fed. App'x 259, 260 (5th Cir. 2015) (collecting cases) (affirming the applicability of the "bodily injury" enhancement where the defendant "struck [the victim] in the face with a closed fist; it was painful; and she experienced some redness on the side of her face"); *United States v. Cerome*, 277 Fed. App'x 85, 86 (2d. Cir. 2008) (affirming enhancement where punch in

the mouth resulted in abrasion on lips and pain in the mouth up to an hour after the punch

because injury was painful and obvious); *United States v. Isaacs*, 947 F.2d 112, 114–15 (4th Cir.

1991) (finding collective testimonial evidence that the victim's face was "reddish" and "red" and

his ears rang after a slap to the face constituted bodily injury even when the victim testified that

the slap was not painful); *Greene*, 964 F.2d at 912 (finding that a slap that resulted in swelling

and the handprint of defendant on victim constituted "bodily injury").

    In *United States v. Washington*, 500 Fed. App'x 279, 284 (5th Cir. 2012), Fifth Circuit

concluded that the application of the "bodily injury" was warranted when a bank robber punched

a victim in the face, despite the fact that there was no apparent lasting injury.  Indeed, the court

observed that there was no direct evidence that the punch "caused [the victim] to be injured, []

suffer[] pain, or that she sought medical attention."  *Id.*  Nevertheless, the Fifth Circuit concluded

that "it is not difficult to describe being punched in the nose with a closed fist as sufficiently

obvious for the purpose of the bodily-injury enhancement."  *Id*.  The Fifth Circuit subsequently

reaffirmed its holding in *Washington* in *United States v. Zuniga*, 720 F.3d 587, 594 (5th Cir.

2013), in which the court found application of the "bodily injury" enhancement in error when the

only description of the purported bodily injury in the record was a statement in the PSR that the

defendant "caused [] pain in her harm" without any description of the injury itself.  Here, the

victim's red abrasion and cut were still clearly visible (*i.e.*, "obvious" within the meaning of

U.S.S.G. § 1B1.1, app. n. 1(B)) twenty-four hours after the incident, when MSP photographed

Victim 1.  Valentini Trial Ex. 2.

    Accordingly, the instant case is distinguishable from the trivial, fleeting, and

undocumented injuries described in the cases relied upon by the defendant, such as *Lancaster*, 6

F.3d at 211 (finding no "bodily injury" where the victim's eyes were affected by a mace-like

spray for only "minutes"), and *United States v. Mieja-Canales*, 467 F.3d 1280, 1282 (10th Cir.

2006) (concluding that the "bodily injury" enhancement could not be applied where the record of

the injury is scant other than descriptions of minor cuts and unsubstantiated statements in a PSR).

*See* DE 278 at 2–7. Indeed, several circuits have rejected *Lancaster*'s holding. *See, e.g.*, *Hight*,

695 F. App'x at 535 (11th Cir.); *Washington*, 500 Fed. App'x at 284 (5th Cir.); *United States v.*

*Robinson*, 20 F.3d 270, 278–79 (7th Cir. 1994). Similarly, the Tenth Circuit recently revisited

the *Mieja-Canales* opinion in *United States v. Dickerson*, 678 Fed. App'x 706, 716–19 (10th Cir.

2017), and limited its application to cases in which the record is incomplete. In *Dickerson*, the

court held that a responding officer's observation that the victim "had several scratches and

redness that resulted from her being shoved to the ground" warranted a "bodily injury"

enhancement because the "scratches and redness" were obvious, unlike in *Mieja-Canales*. The

obvious, documented red abrasion and cut to Victim 1's lip are analogous to the redness and

scratches found to be "bodily injury" in *Dickerson*, and, for the same reasons, distinguishable

from the unsubstantiated descriptions of *Mieja-Canales*.

B. <u>Defendants Demonstrated the Capacity to Carry Out Their September 30, 2013 Death Threat and U.S.S.G. § 2B3.2(b)(3)(B)(ii) Applies to the Defendant</u>

Pursuant to U.S.S.G. § 2B3.2(b)(3)(B)(ii), if the defendant (or his co-conspirators)

"demonstrated the ability to carry out a threat" of death or "serious bodily injury," the baseline

level offense is increased by three. Application Note 6 to U.S.S.G. § 2B3.2(b)(3)(B)(ii) provides

that "an extortionate demand may be accompanied by conduct that does not qualify as a display

of a dangerous weapon under subsection (b)(3)(A)(v) but is nonetheless similar in seriousness,

demonstrating the defendant's preparation or ability to carry out the threatened harm (e.g., . . . a

threat to kidnap a person accompanied by information showing study of that person's daily

routine)."  The Probation Office found, PSR ¶ 11(b), 14, and the government agrees, that the defendants' September 30, 2013 death threat expressly stated a threat of death and that the defendants demonstrated the ability to carry out such a threat.

Other circuits have determined that statements are to be considered threats when the statement implies "the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it." *United States v. Penn*, 966 F.2d 55, 56 (2d. Cir. 1992).  In *United States v. White*, 654 Fed. App'x 956, 969 (11th Cir. 2016), the defendant similarly argued that there was insufficient evidence that he had made preparations or demonstrated capacity to carry out the threat.  The Eleventh Circuit affirmed the application of the U.S.S.G. § 2B3.2(b)(3)(B) enhancement on the grounds that the defendant had demonstrated "ability to carry out the threat" because he had shown "intimate knowledge of the [threatened] officials and their families," including their names, addresses, and that their children were at school.  *Id.* at 970.  The Seventh Circuit came to a similar conclusion, finding that the enhancement was warranted when the defendant threatened the victim and the victim's parents and there was evidence that the defendant knew the addresses of both the victim and the victim's parents.  *United States v. Hacha*, 727 F.3d 815, 817–18 (7th Cir. 2013).  The *Hacha* court held that evidence that the defendant knew the identities and addresses of the threatened individuals was "close to the example of demonstrated ability in Application Note 6 to the extortion guideline" described above.  *Id.*  This case is no different from *Hacha* and *White*.

On September 30, 2013 the defendant and his co-conspirator threatened to kill Victim 1 if he continued to refuse to pay him.  Victim 1 testified at Valentini's trial that co-defendant Calabrese "told me if I didn't smarten up, they would bury me in my woods" and "[h]e pointed or looked over—pointed over to the excavator that was there from the construction company."

Tr. 12/15/17 at 33.  Victim 1 further testified that the defendant added that they would cut off his head first.  *Id.*  There is no doubt that this was a death threat made in furtherance of the extortion scheme.  And, to put an emphasis on their threat, the defendants physically assaulted Victim 1, showing that they were not afraid to use physical violence.

And, in the context of Springfield organized crime, this specific death threat was far from an idle threat.  Victim 1 knew that the defendants were part of a larger organization, an organized crime family that had murdered in the past, and not just in New York.  During the Valentini trial, MSP Captain Thomas Murphy testified that Genovese made-man-turned-informant Anthony Arillotta (Santaniello's co-defendant in an earlier criminal case) was involved in the assassination of Genovese capo Al Bruno in November 2003 and that earlier that same month Gary Westerman, a Genovese associate and informant, disappeared  Tr. 12/12/17 at 15–17.  In 2010, Westerman's body was found buried "in an eighty-foot grave in a wooded area in back of a residential dwelling in the town of Agawam."  *Id.*  Victim 1 testified that the September 30, 2013 death threat was "terrifying . . . Because I think of the—the local history and what has happened in this area."  Tr. 12/15/17 Tr. at 33–34.  Furthermore, multiple witnesses testified that Victim 1's property—where defendant and his co-conspirator arrived unannounced and issued the death threat—was isolated, rural, and a construction site.  *See, e.g.*, Tr. 12/15/17 at 22.

Victim 1 testified later that even with MSP on site during his October 9, 2013 meeting with the defendant and Calabrese, the troopers were concealed on the property far enough away that "it would have taken them a good amount of time to get to me.  They probably would have had to run 300 feet to get to me to help me if these guys try to, you know, beat me, stab me, shoot me, whatever they were planning."  *Id.* at 44.  Later, in a recorded meeting on October 16, 2013, Victim 1 told defendant Depergola that the defendants had told him they knew where he

was then living, in a penthouse in Hartford.  Victim 1 was shocked that they knew where he lived

and wondered how they figured it out.  Depergola raised this issue again at a November 8, 2013

recorded meeting with Victim 1, attempting to assure Victim 1 that it was not he (Depergola)

who gave up Victim 1's address:  "[I]f someone had said I'll give you a million dollars, take me

to his house I wouldn't be able to take him.  I swear to god.  I wouldn't be able to take them to

your place in—I don't even remember.  I know it was on W, was it W or West—I don't even

know. . . .  I didn't even know you were still there."  Valentini Trial Ex. 57 at 6.  With the

isolation, the excavator, the knowledge of where Victim 1 was then living, was going to be

living, and where he worked, and the ghost of Westerman, the death threat was real and the

defendants had the means to carry it out.

The Sentencing Guidelines also recognize the danger and egregiousness of the

involvement of organized crime in an extortion offense.  In application note 8 to U.S.S.G.

§ 2B3.2(b)(3)(B), the Guidelines state:  "If the offense involved organized criminal activity, or a

threat to a family member of the victim, an upward departure may be warranted."  The

involvement of organized crime inherently lends credence to the threat, because organized

crime—and most certainly the Genovese mafia organization—have demonstrated a capacity to

kill in the past.  In *United States v. Ponaro*, 266 F.3d 939, 954 (9th Cir. 2001), the Ninth Circuit

affirmed application of the enhancement when defendant and his co-conspirators "actively

prepared to extort the auto shop and loansharking businesses . . . by orchestrating a show of force

that would threaten him with death or serious bodily injury."  In that case, one of the co-

conspirators testified at trial that having the three co-conspirators show up at the extortion

victim's auto shop "was significant because it 'would be enough to let [the victim] know[] that

these are members of the mafia and if he doesn't leave he's going to have problems from other

14

people too.'"  Similarly, here the defendants made a "show of force" by showing up at Victim

1's remote property, threatening him with death, and representing themselves as the new mafia

crew in town, taking over for Bruno.

IV.    THE DEFENDANT MERITS A SENTENCE OF 78 MONTHS

     For the reasons that follow, the government respectfully recommends a sentence of

78 months, the high end of the applicable Guidelines range, to be served consecutive to the

defendant's S.D.N.Y. sentence, and a period of three years of supervised release.  In this case, a

78-month consecutive sentence best represents the statutory sentencing goals articulated in 18

U.S.C. § 3553(a).

    A.    The Defendant Has Engaged in Organized Criminal Conduct for More than a Decade
       and Prior Custodial Sentences Have Failed to Deter Him

     Unlike co-defendants Daniele and Calabrese, the defendant has an extensive criminal

history, including convictions for the same loan sharking and extortionate conduct that forms the

basis of the current convictions.  Indeed, the defendant has previously been charged along with

current co-defendant Valentini on loan sharking and illegal gambling charges.  PSR ¶ 69.  Prior

to that case, the defendant amassed convictions for assault and battery with dangerous weapon

(five counts in three separate cases), making false statements, driving under the influence of

liquor, assault and battery and malicious destruction of property, and assault with a dangerous

weapon.  PSR ¶¶ 61–68.  He has served several two-year or two-and-one-half year sentences

with little deterrent effect, because in 2016, he was indicted in two separate federal jurisdictions

for extortionate schemes involving three separate victims between 2013 and 2015.  PSR ¶ 70.

     The defendant's involvement in organized crime is not by accident.  He grew up in

organized crime, with his father having served a federal sentence for illegal gambling, a case in

which the defendant's grandmother and other relatives were co-defendants.  PSR ¶ 82.  This longstanding relationship to organized crime suggests that a significant sentence is necessary to deter him from returning to that life.

Accordingly, a significant sentence is necessary to both serve as deterrence and to reflect the nature and characteristics of the defendant.  *See* 18 U.S.C. § 3553(a)(1) and (2)(B).  Furthermore, the defendant's crimes of conviction in this case—as in the S.D.N.Y. case—were not victimless crimes.  Two citizens were threatened, harassed, and forced to pay money by the defendant and his larger organization.  The power of organized crime is that each associate is made more intimidating, more powerful by his connection to the larger criminal organization.  As the evidence presented in the Valentini trial showed, the defendant's strength was at least in part derived from his associates both visible (Depergola, Calabrese, and Valentini) and invisible ("they" and "him" in New York).  As a consequence, a significant sentence is necessary both to deter others and to protect the public.  *See* 18 U.S.C. § 3553(a)(C).

B.  <u>The Defendant Is Violent and Warrants a Greater Sentence than His Co-Conspirators</u>

Congress has instructed sentencing courts to take into account sentences of like defendants when imposing a sentence in order to "avoid unwarranted sentencing disparities."  *See* 18 U.S.C. § 3553(a)(6).  Congress also called for a sentence to reflect "just punishment for the offense."  18 U.S.C. § 3553(a)(2)(a).  As in all criminal organizations and conspiracies, different defendants play different roles both in nature and in scope.  In this case, the defendant did not play but rather fulfilled the role of the violent enforcer, both with respect to Victim 1 and Victim 2.

With respect to Victim 2, Daniele called him in when Victim 2 fell behind on payments.  And, with respect to Victim 1, the defendant identified him as a target and threatened him

directly on multiple occasions.  His unpredictable, tempestuous reputation itself intimidated Victim 1.  As Victim 1 testified at trial, on September 30, 2013 when he first saw the defendant on his land, he thought "oh fuck" and he thought that "because I knew what kind of person Ralph was."  Trial Tr. 12/15/17 at 23.  Victim 1 also testified that when he met Depergola alone on October 10, 2013, he was "caught off guard and scared again" when Calabrese and the defendant showed up unexpectedly.  *Id.* at 85.  Victim 1 testified that he felt that way because "every time I dealt with Ralph, it was more of a threat than the others."  *Id.*  "He was nastier, looking at me all crazy and threatening."  *Id.*  When describing how he felt when the defendant asked him to "walk with me" around the corner of the East Longmeadow Starbucks on October 23, 2013, Victim 1 testified:  "he had that rage in his eyes like he's, you know amped up—amped up on something or just so pissed off.  He is trying to get me to walk away.  He has his hands in his pockets.  You can't see what he has go in his hands.  He could have a gun, a knife, or brass knuckles, who knows."  *Id.* at 88.

In addition to the threats, of course, the defendant actually struck Victim 1.  He used physical violence, consistent with his past violent behavior, to intimidate.  As described above, the defendant stunned Victim 1 momentarily and caused a cut to his lip and a red abrasion.

Such conduct deserves not only just punishment, but also a significantly more severe punishment than that Daniele received.  Daniele received a sentence of 24 months for extortionately collecting on his loan to Victim 2.  Daniele did not use actual violence—just the threat of violence—and was only involved in the extortion of Victim 2, not Victim 1.  The defendant played a leading role in the extortion of Victim 1, including using physical violence and threat of death, an participated in the extortion of Victim 2.  Accordingly, a 78-month consecutive sentence is warranted.  By contrast, the defendant's suggestion of a 48-month

concurrent sentence would result in an effective sentence of merely 18 months for the four counts of conviction in the instant and the harm to two victims and their families.  Such a result would not adequately reflect the seriousness of the offenses or the defendant's role in them.

V.      DEFENDANT'S MOTION FOR A DOWNWARD VARIANCE SHOULD BE DENIED

The defendant moved for a downward variance of thirty months on the grounds that his daughter's health requires his presence.  *See* DE 267 at 10–19.  While the defendant's daughter suffers from a serious medical condition, a downward variance is not appropriate in this case. While the defendant claims that his assistance is necessary to provide adequate care to his daughter, the PSR and his own memorandum suggests that the defendant and his daughter have a significant family support structure.  This support structure has managed to care for the defendant's daughter during his nearly two years of pre-trial detention.

VI.     CONCLUSION

For the foregoing reasons, the Government respectfully asks that the Court impose a sentence of 78 months, consecutive to the defendant's 30-month sentence from S.D.N.Y., followed by three years of supervised release.  The Government further requests that the Court enter the proposed forfeiture orders to be filed prior to sentencing and enter an order of restitution to the Hampden County District Attorney's Office in the amount of $20,000.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     */s/ Katharine Wagner*
        Katharine Wagner
        Kevin O'Regan
        Assistant United States Attorneys

18

300 State Street, Suite 230
Springfield, MA 01105
413-785-0330
katharine.wagner@usdoj.gov


DAVID L. JAFFE
Acting Chief
Department of Justice
Organized Crime and Gang Section

By:     */s/ Marianne Shelvey*
Marianne Shelvey
Trial Attorney
1300 New York Ave, NW
Washington, DC 20005
Marianne.Shelvey@usdoj.gov

Submitted:  April 8, 2018




CERTIFICATE OF SERVICE

Hampden,  ss.                          Springfield, Massachusetts
                                       April 9, 2018


        I, Katharine A. Wagner, Assistant U.S. Attorney, hereby certify that the foregoing was
filed through the Electronic Court Filing system and will be sent electronically to the registered
participants as identified on the Notice of Electronic Filing.



                          /s/ Katharine A. Wagner
                          KATHARINE A. WAGNER
                          Assistant United States Attorney