# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,  .  CRIMINAL NO. 3:16-cr-30033-TSH
     Plaintiff          .  Defendants: 1, 2, 3, 4 & 5

        v.            .  SPRINGFIELD, MASSACHUSETTS
                 .  AUGUST 11, 2016

SANTANIELLO et al,    .
     Defendant         .       \*\*EXCERPT\*\*

. . . . . . . . . . . . . .

### TRANSCRIPT OF DETENTION HEARING
### BEFORE THE HONORABLE KATHERINE A. ROBERTSON
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:   UNITED STATES ATTORNEY'S OFFICE
                     BY: Kevin O'Regan, AUSA
                     Suite 230
                     United States Courthouse
                     300 State St.
                     Springfield, MA 01105
                     413-785-0142
                     kevin.o'regan@usdoj.gov

                     UNITED STATES ATTORNEY'S OFFICE
                     BY:  Marianne Shelvey, AUSA
                     U.S. Department of Justice
                     1301 New York Avenue, N.W.
                     Suite 700
                     Washington, DC 20005
                     202-549-4051
                     marianne.shelvey@usdoj.gov

For Defendant 1:      Daniel D. Kelly, Esq.
Ralph Santaniello     Law Offices of Daniel D. Kelly
                     33 Mulberry Street
                     Springfield, MA 01105
                     413-733-0770
                     dkelly@dankellylawoffices.com

For Defendant 2:      Jeremy B. Powers, Esq.
Giovanni Calabrese    Attorney at Law
*a/k/a* Johnny Cal     33 Mulberry Street
*a/k/a* John Calabrese  Springfield, MA 01105
                     413-306-6107
                     jeremybpowers@yahoo.com
                     *PRO HAC VICE*

2

```
1                              Daniel D. Kelly
                               115 State Street
2                              Suite 300
                               Springfield, MA 01103
3                              413-733-0770
                               dkelly@dankellylawoffice.com
4

5    For Defendant 3:          Michael J. Entin, Esq.
     Gerald Daniele           Law Office of Michael J. Entin
6                              One East Broward Boulevard
                               Suite 925
7                              Fort Lauderdale, FL 33301
                               954-745-4900
8                              mjentin@aol.com
                               PRO HAC VICE
9
                               Philip H. Lauro, Esq.
10                             33 Elliot Street
                               Springfield, MA 01105
11                             413-732-1188
                               philiplauro@yahoo.com
12
     Defendant 4:             Stuart Weissman, Esq.
13   Francesco Depergola      Attorney, at Law
     a/k/a Frank Depergola    930 Main Street
14   a/k/a Sammy Depergola    Springfield, MA 01103
                               413-732-0291
15                             stuart.weissman@comcast.net

16                             Bernard T. O'Connor , Jr., Esq.
                               O'Connor Martinelli, Cohn, Pikula,
17                             & Cullinan
                               1391 Main Street
18                             Harrison place, Suite 1022
                               Springfield, MA 01103
19                             413-781-5311
                               boconnor@omcp-law.com
20
     Defendant 5:             Jared Olanoff, Es.q
21   Richard Valentini        73 Chesnut Street
                               Springfield, MA
22                             413-731-7000
                               jared@olanofflaw.com
23
         Court Reporter:
24
         Proceedings recorded by electronic sound recording,
25       transcript produced by transcription service.
```

**Judy Bond**
**Certified Federal Court Transcriber**
**508.984.7003**

3

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

**Government's:**

SPECIAL AGENT ROBERT ZANOLLI

(By Ms. Shelvey)           5

| EXHIBITS | DESCRIPTION | MARKED | IN EVIDENCE |
|---|---|---|---|

**Government's:**

| 1 | Photograph | -- | 20 |
| 10, 11, 12 | Defendant Santaniello Arrest Reports | -- | 85 |
| 13 | Defendant Calabrese Arrest Reports | -- | 86 |
| 2A, B, C | DVDs and Transcript | -- | 46 |
| 3A, B, C | DVDs and Transcript | -- | 46 |
| 4 | Surveillance Photograph | -- | 43 |
| 5A | DVD | -- | 49 |
| 5B | Transcript | -- | 51 |
| 6 | DVD | -- | 52 |
| 7A & B | DVD and Transcript | -- | 54 |
| 8A-F | Restraining Order Records | 64 | 64 |
| 9 | Defendant Danielle Arrest Report | -- | 85 |

02427

1 (3:15:52 P.M.)

2    SPECIAL AGENT ROBERT ZANOLLI, GOVERNMENT WITNESS, SWORN

3                      DIRECT EXAMINATION

4 BY MS. SHELVEY:

5 Q.    Good afternoon.

6 A.    Good afternoon.

7 Q.    I'm going to ask you to keep your voice up, and if you

8 could, please just state your name and spell your last for

9 the record.

10 A.    Yes.  The first name's Robert.  The last name is

11 Zanolli.  The last name is spelled Z-A-N-O-L-L-I.

12 Q.    Sir, where are you employed?

13 A.    I'm currently provided with the FBI here in

14 Springfield, Massachusetts.

15 Q.    In what capacity are you employed with the FBI?

16 A.    I'm employed as a special agent here at the FBI.

17 Q.    Are you assigned to a specific unit?

18 A.    Yes.  I'm assigned specifically to investigate

19 organized crime.

20 Q.    And how long have you been assigned to investigations

21 of organized crime within the western part of the state?

22 A.    Approximately four years.

23 Q.    And during those four years, have your investigations

24 focused on a specific crime family?

25 A.    Yes, they have.

02428

Zanolli - Direct by Shelvey

5

1 Q.   And can you explain a little bit about what -- the

2 crime families that you are investigating here in Western

3 Mass.?

4 A.   The crime families that we predominately investigate

5 are Italian organized crime, also known as the Mafia or the

6 Mob.

7 Q.   And the Mob itself or the Mafia, is that made up of

8 multiple crime families?

9 A.   Yes, it is.

10 Q.   Is there a specific family or families that have a

11 presence in Western Massachusetts?

12 A.   Yes.  Historically the Genovese crime family had a

13 presence here in Western Massachusetts for quite a while,

14 since before the 1980s.

15 Q.   And during this investigation in your discussions with

16 other members of law enforcement, have you had the

17 opportunity to become familiar with the Genovese crime

18 family itself?

19 A.   Yes, I have.

20 Q.   Is there a certain structure within the crime family?

21 A.   Yes, there is.

22 Q.   Can you describe a little bit about that structure?

23 A.   The basic structure of a crime family, in this case

24 Genovese crime family, is at the top there's the boss.  Then

25 there's the under boss, followed by the Capo, and then

1 soldiers, and below that are the associates.

2 Q.   And as it relates specifically to Western Mass., which

3 level or which layer would be predominately responsible for

4 controlling Western Massachusetts?

5 A.   The associates.

6 Q.   Do they report to anyone?

7 A.   Yes, they do.

8 Q.   And who do they report to?

9 A.   They report to acting Capo by the name of Eugene

10 Onofrio, also known as the *Rooster.*

11 Q.   And that's as it stands today?

12 A.   Yes, that's correct.

13 Q.   And is this the same Eugene Onofrio that was also

14 indicted in the New York case recently?

15 A.   Yes, he was.

16 Q.   I want to go back a little bit and talk about the

17 Genovese, La Cosa Nostra (LCN).  Are there certain rules and

18 regulations that members of the Genovese family are

19 required, an oath they're required to take?

20 A.   Yes, they are.

21 Q.   What is that?

22 A.   It's secret oath.  It's called omertà.  That's a code

23 of silence.  It's also -- they also agree to not cooperate

24 with authorities, specifically law enforcement.

25 Q.   And how are you aware of this omertà?

02430

1 A.   I'm aware of this omertà through training and

2 experience as a special agent with the FBI.

3 Q.   Have you had the opportunity to engage and speak with

4 members of law enforcement as well as members of the Cosa

5 Nostra?

6 A.   Yes, I have.

7 Q.   Now, who takes this oath?

8 A.   Only "made" members of organized crime take this oath.

9 Q.   What is a "made" member?

10 A.   A "made" member is somebody who takes a secret oath, a

11 secret ceremony; swearing in, if you will.  They swear to

12 omertà, the secrecy of the family, and agree to abide by the

13 family's rules and regulations.

14 Q.   Is one of those rules or regulations to protect the

15 family?

16 A.   Yes, it is.

17 Q.   I think you mentioned before something about not

18 cooperating with law enforcement?

19 A.   Yes, that's correct.

20 Q.   Now, as you were going through this investigation, you

21 mentioned that -- this case started --

22    The Genovese family has had a presence here in Western

23 Massachusetts since sometime since at least the 80s?

24 A.   Yes, that's correct.  Well before the 80s.

25 Q.   I don't want to go all the way that far back, but

02431

Zanolli - Direct by Shelvey

8

1 starting in about the late 1990s, the mid to late 1990s, was

2 the Western Mass. area controlled by an individual, a

3 Genovese member?

4 A.   Yes.

5 Q.   Who was that?

6 A.   That member was Adolfo Bruno, also known as a *Big Al.*

7 He was at the time a "made" member of the Genovese crime

8 family, and he was the boss locally here.

9 Q.   Is there a difference between being the boss locally

10 and being the boss?

11 A.   Yes.  There's a significant difference between being

12 the boss of a family, say New York City; versus being the

13 boss here in Springfield.

14      In this case when Adolfo Bruno was the boss, he was

15 actually a soldier and a "made" member of the Genovese

16 family.

17 Q.   And you mentioned New York City.

18      Where is the Genovese family located predominantly?

19 A.   Predominantly in New York City.

20 Q.   What types of activities, first, is the Genovese family

21 as a whole engaged in?

22 A.   The Genovese crime family, they engage in a variety of

23 criminal activities, including racketeering, loan sharking,

24 gambling, extortion, witness intimidation, murder, fraud,

25 dealing in stolen property, drug trafficking, weapons

02432

Zanolli - Direct by Shelvey

9

1 trafficking, et cetera.

2 Q.   And as it relates to Western Massachusetts

3 specifically, in your experience and in discussions with

4 other members of law enforcement, what type of activities

5 have members of the Genovese family engaged in?

6 A.   Traditionally here:  murder, extortion, loan sharking,

7 gambling, fraud.

8 Q.   I'm going to talk a little bit about Al Bruno.

9      Can you give the Court a little bit of what the Western

10 Massachusetts crime was like under Al Bruno?

11 A.   At the time starting around the early or mid 90s, Al

12 Bruno was -- like I said, he was the boss of Western

13 Massachusetts, predominately Springfield Metropolitan Area.

14      Under him he had several associates who controlled his

15 rackets, his criminal activity, while he was the boss here.

16 Q.   Who are some of the individuals he would associate with

17 around that time frame?  Who are some of his known

18 associates?

19 A.   His known associate at that time, his right-hand man

20 was Frank Depergola.  Other associates were "made" member

21 Anthony Arillotta.  Ty and *Freddy* Geas were associates.

22 Ralph Santaniello was an associate.  Richard Valentini was

23 an associate.  Johnny Calabrese was an associate.  And there

24 are several others.

25 Q.   And you mentioned Frank Depergola.

02433

1       The individual that you know as Frank Depergola, is

2  that Francisco Depergola?

3  A.  Yes, that's correct.

4  Q.  And do you see that individual here in court today?

5  A.  I do.

6  Q.  Can you please identify him for the record?

7  A.  Yes.  He's sitting in the jury box, first person on the

8  left.

9          MR. SHELVEY:  Your Honor, may the record reflect

10  identification of the defendant?

11          THE COURT:  Yes.

12  Q.  And you mentioned the name Ralph Santaniello.

13      Do you see that individual in the courtroom today?

14  A.  Yes, I do.

15  Q.  Can you please identify him for the record?

16  A.  He's also in the jury box.  He is the fourth person in

17  from the left.

18  Q.  You mentioned the name John Calabrese.  Giovanni

19  Calabrese?

20  A.  Yes, that's correct.

21  Q.  Do you see Mr. Calabrese here in the courtroom?

22  A.  I do.  He's also in the jury box.  He's the third

23  person from the left.

24  Q.  And the name --

25      Do you know an individual by the name of Richard

02434

Zanolli - Direct by Shelvey

11

1  Valentini?

2  A.   Yes, I do.

3  Q.   And do you see Mr. Valentini in the courtroom?

4  A.   Yes.  Mr. Valentini is the second person from the left.

5  Q.   And as it relates to -- excuse me.

6        MR. SHELVEY:  Your Honor, may the record reflect

7  identification of those four defendants?

8        THE COURT:  Yes, it may.

9        MR. SHELVEY:  Thank you.

10 Q.   As it relates to Mr. Valentini, is he also an associate

11 of the Genovese crime family?

12 A.   Yes, he is.

13 Q.   Do you know an individual by the name of Gary

14 Westerman?

15 A.   Yes, I do.

16 Q.   And first, for the Court, who is Mr. Westerman?

17 A.   Gary Westerman was an associate of organized -- of the

18 Genovese crime family quite a while ago in approximately

19 2003, 2004.  Gary Westerman disappeared, and it was presumed

20 that he was murdered.  In approximately 2010 Gary Westerman

21 was discovered to be dead, and his body was dug up and

22 recovered in Agawam, Massachusetts.

23 Q.   Now, as it relates to Mr. Westerman's death, was that

24 ruled a homicide?

25 A.   Yes, it was.

02435

1 Q.   Were individuals subsequently convicted for the

2 homicide -- of the death of Mr. Westerman?

3 A.   Yes, they were.

4 Q.   Who was that?

5 A.   That was Anthony Arillotta, Emilio Fusco, Ty Geas and

6 *Freddy* Geas.

7 Q.   And Mr. Arillotta subsequently cooperated with the

8 government?

9 A.   Yes, he did.

10 Q.   And what was the explanation for the death of Gary

11 Westerman?

12 A.   The explanation for the death of Gary Westerman was

13 that he was believed to be a cooperator for law enforcement

14 at that time, which was true.

15 Q.   Cooperating in what sense?

16 A.   Cooperating against members of organized crime.

17 Q.   And he went missing sometime in 2002, 2003?

18 A.   Yes, he did.

19 Q.   Now, Al Bruno, was he also killed?

20 A.   Yes, he was.

21 Q.   And when was he killed?

22 A.   He was killed November 23, 2003.

23 Q.   Prior to his death was Mr. Bruno collecting and

24 extorting members of the community?

25 A.   Yes, he was.

02436

Zanolli - Direct by Shelvey

13

1  Q.   What types of extortion was he involved in?

2  A.   At the time Adolfo Bruno was involved in the extortion

3  of both legitimate and illegitimate businesses here in

4  Springfield, Massachusetts, and Western Massachusetts.

5  Q.   Based on your experiences and speaking with other

6  members of law enforcement, did you learn that he was

7  collecting street tax from --

8  A.   Yes.  Yes.  That's correct.  He was.

9  Q.   Now, at the time that Al Bruno, Adolfo Bruno, was

10 murdered, who was with him on the night that he was killed?

11 A.   That would be Frank Depergola was with him the night he

12 got murdered.

13 Q.   And where was he murdered?

14 A.   He was murdered at the Mount Carmel Society, also known

15 as the Italian Club.

16 Q.   During the course of the investigation, did you learn

17 that there was concerns that Al Bruno was cooperating with

18 law enforcement?

19 A.   Yes.

20 Q.   And can you explain a little bit about what that belief

21 was or why that came to be a belief by members of the

22 Genovese crime family?

23 A.   There was a belief by members of Italian organized

24 crime at that time that Al Bruno was cooperating, that

25 information was forwarded to the boss in New York City.  At

02437

Zanolli - Direct by Shelvey

1  that time they deemed --

2      Let me back up.  They basically gave the approval for

3  the hit on Adolfo Bruno because of that.

4  Q.    And why did they believe that Adolfo Bruno was actually

5  an informant for the FBI or working with law enforcement?

6  A.    They believed he was an informant for law enforcement,

7  because he had made contact and spoken with a member of law

8  enforcement; specifically, an FBI agent.

9  Q.    Did it come to turn out that he actually wasn't giving

10  information?

11  A.    That's correct.

12  Q.    But that was the whole basis for the murder?

13  A.    Yes, that's correct.

14  Q.    And who were the individuals that were involved in his

15  murder?

16  A.    The members that were directly involved in his murder

17  were Frankie Roche who pulled the trigger and shot Adolfo

18  Bruno, Ty Geas and *Freddy* Geas, and Anthony Arillotta who

19  was orchestrating it.

20  Q.    And this order came from where?

21  A.    Could you repeat the --

22  Q.    Where did the order to murder Al Bruno come from?

23  A.    The order came from New York City, the head of the

24  Genovese crime family.

25  Q.    And as part of the Genovese rules, if you will, do they

02438

Zanolli - Direct by Shelvey

15

1 have the ultimate say on who is murdered in the name of the

2 family, or who can be killed in the name of the family?

3 A.   Yes, that's true.   They have to get approval from New

4 York to do a hit or to kill somebody.

5 Q.   When you say "from New York," about how large is the

6 Genovese crime family?

7 A.   The Genovese crime family has thousands of members,

8 associates.   It's one of the top two biggest families in New

9 York City along with the Gambino crime family.

10 Q.   So orders to quiet or silence a witness would come from

11 New York?

12 A.   Yes.

13 Q.   Okay.   Now, I want to move forward to 2013 and to the

14 focus of this investigation.

15      Did you ultimately become involved in the investigation

16 in to Ralph Santaniello, Giovanni Calabrese, Frank Depergola

17 and Richard Valentini?

18 A.   Yes, I did.

19 Q.   Can you explain to Her Honor how you became involved in

20 this investigation?

21 A.   The way I got involved in the investigation first was

22 with contact with Massachusetts State Police Special

23 Services Section.   They had been -- they had an individual

24 who came and reported -- being a owner of a legitimate

25 business, a tow company, they came and reported being

*Judy Bond*
*Certified Federal Court Transcriber*
*508.984.7003*

02439

1 extorted by members of organized crime.

2          MR. SHELVEY:  Your Honor, I made -- there's a copy

3 of all the exhibits that I have recorded if you'd like them.

4          THE COURT:  Have defense counsel seen copies of

5 the exhibits?

6          MR. SHELVEY:  Yes, Your Honor.  I'd made copies

7 for defense counsel.

8          THE COURT:  Okay.  I'd like to mark them.  I'd

9 like to have Ms. Calderon mark them as --

10          MR. SHELVEY:  I believe most of them are already

11 marked.

12          THE COURT:  Okay.

13          MR. SHELVEY:  May I approach?

14          THE COURT:  Yes, absolutely.

15          So these are copies of the documents that you're

16 going to use as exhibits.  So if as you're going through you

17 see that you have failed to mark one, we will at that time

18 mark it.

19          MR. SHELVEY:  Thank you, Your Honor.

20          THE COURT:  Thanks.

21          MR. SHELVEY:  Your Honor, I have the original

22 copies that I intend to introduce.  That's just for the

23 Court.

24          THE COURT:  Yes.  No, I understand.

25 BY MS. SHELVEY:

Zanolli - Direct by Shelvey

17

1  Q.   Now, in or about October 1st of 2013, did Victim One

2  meet with law enforcement?

3  A.   Yes, he did.

4  Q.   At the time that Victim One met with law enforcement,

5  did they have an opportunity to speak with him about what

6  had occurred?

7  A.   Yes, they did.

8  Q.   Did they learn as to whether there were any injuries as

9  a result of what had occurred the day before?

10  A.   Yes, they did.

11  Q.   First, in summary fashion, can you please tell us what

12  Victim One told law enforcement on October 1st of 2013?

13  A.   Victim One told law enforcement that he was approached

14  at his residence by members of organized crime, specifically

15  Ralph Santaniello, John Calabrese, and they told him that

16  basically he was going to pay a street tax in the amount of

17  $20,000.

18  Q.   Did they identify as to why they were approaching him

19  specifically and telling him that he was going to be paying

20  street tax?

21  A.   Yes.  They indicated that he had paid Al Bruno in the

22  past, and that he was going to start paying them, as well.

23  Q.   And did you confirm that, in fact, Victim One had made

24  payments in the past to Al Bruno before his death in 2003?

25  A.   Yes.

02441

Zanolli - Direct by Shelvey

18

1  Q.   And since 2003 had Victim One made any street tax

2  payments to anyone?

3  A.   No, he did not.

4  Q.   Did the approaching ten years later, was that a

5  surprise to Victim One?

6  A.   Yes, it was.

7  Q.   And when law enforcement was interacting with Victim

8  No. 1, did they make any observations about any injuries?

9  A.   Yes, they did.

10  Q.   Did Victim One explain how the injuries occurred?

11  A.   Yes, he did.

12  Q.   Can you explain what law enforcement was told by Victim

13  One?

14  A.   Yes.  Victim One explained that he was struck by Ralph

15  Santaniello in the side of the face.  He had bruising on the

16  side of his face as well as a cut on his lip.

17  Q.   I'm going to show you Government's Exhibit 1.

18       Sir, I'm going to ask you to take a look at it.  Do you

19  recognize that individual?

20  A.   Yes, I do.

21  Q.   Who is that individual identified as?

22  A.   That is Victim One.

23  Q.   And are the injuries in that photograph, those are the

24  injuries depicted that were mentioned to law enforcement on

25  October 1st of 2013?

02442

Zanolli - Direct by Shelvey

19

1  A.    Yes, they are.

2         MR. SHELVEY:  I'm going to ask that this be marked

3  as Exhibit 1.

4       GOVERNMENT EXHIBIT NO. 1, ADMITTED

5  BY MS. SHELVEY:

6  Q.    After discussions with law enforcement on October 1st

7  of 2013, did Victim One agree to cooperate with them?

8  A.    Yes, he did.

9  Q.    And did he agree to make both audio and visual

10 recordings of what had occurred or make any type of

11 payments?

12 A.    Yes, he did.

13 Q.    Was an arrangement made between law enforcement and

14 Victim One where law enforcement would make the street tax

15 payments for him?

16 A.    Yes, that's correct.

17 Q.    And over the course of the investigation, how much

18 money was paid to the defendants in extortion?

19 A.    A total amount of $20,000 was paid.

20 Q.    I direct your attention to October 4th of 2013.

21       Did law enforcement and Victim One make contact with

22 any individuals as relates to this investigation?

23 A.    Yes, they did.

24 Q.    And who was that?

25 A.    Victim No. 1 came in contact with Ralph Santaniello and

02443

Zanolli - Direct by Shelvey

20

1 John Calabrese -- I'm sorry.  Johnny Calabrese and Richard

2 Valentini.

3 Q.    In the discussions on October 4, did they have a chance

4 to recap what had occurred on September 30th of 2013?

5 A.    Yes, they did.

6 Q.    And specifically, on September 30th of 2013, aside from

7 the injuries, what did Victim One tell you about that

8 conversation?

9 A.    I believe Victim One said that -- that he couldn't

10 understand why he was being slapped around.

11 Q.    But when we're talking --

12      We're talking about September 30 specifically, before

13 we get to the October 4 discussion.

14      On September 30 what specifically did Victim No. 1 tell

15 law enforcement about the whole extortion plan?

16 A.    Could you repeat the question?

17 Q.    September 30 did Victim One encounter individuals?

18 A.    Yes, he did.

19 Q.    On October 1 did he speak with law enforcement about

20 what had occurred?

21 A.    Yes, he did.

22 Q.    Can you relay to the Court the conversation that Victim

23 One had with law enforcement about the incident on September

24 30?

25 A.    Yes.  Victim One had stated that he was told by Ralph

02444

1 Santaniello and John Calabrese that he had owed $50,000 to

2 them.  They also told him that if he didn't pay, that they

3 would chop his head off and bury him in the back yard.

4 Q.   What was the explanation for how the $50,000 number

5 came about?

6 A.   That explanation was given as a result of the time he

7 had not paid any street tax between the time that Al Bruno

8 was murdered and the current time where he was being

9 approached and extorted by John Calabrese, Ralph

10 Santaniello, Frank Depergola and Richard Valentini.

11 Q.   During that same discussion, did the victim explain to

12 you where this took place?

13 A.   Yes.

14 Q.   Where was that?

15 A.   It was in Hampden, Massachusetts, at his residence.

16 Q.   During the course of the investigation, did you learn a

17 little bit about Victim One's residence?

18 A.   Yes.

19 Q.   Is it in a remote area?

20 A.   Very remote, yep.

21 Q.   Can you please describe a little bit about that to the

22 Court?

23 A.   The residence is located in Hampden, Massachusetts.

24 It's located in the country on about 60 acres.

25 Q.   And at the time that Victim One was approached by Ralph

1 Santaniello and John Calabrese, was he on the property

2 alone?

3 A.   Yes, he was.

4 Q.   Was there any types of buildings or anything on the

5 property at that time?

6 A.   Yes.  There were some construction-type buildings.

7 Q.   What was in the process of doing?

8 A.   He was in the process of building a house.

9 Q.   What other information did Victim One give you about

10 the conversation that occurred on October 30th of 2013?

11 A.   Would you repeat the question?

12 Q.   What other information aside from the $50,000 did

13 Victim One tell you occurred during that discussion on

14 October 30, 2013?

15 A.   I believe they said that -- something to the effect of

16 that they were going to help him grow his business, and they

17 were going to help him with this if he had paid them, help

18 him keep his contracts with the city.

19 Q.   What do you mean keep his contracts with the city?

20 A.   He currently has -- Victim No. 1 currently has a

21 contract with the City of Springfield to tow vehicles and so

22 on and so forth.  They were referring to him keeping his

23 contract versus having them force him to lose his contract

24 and his business with the city.

25 Q.   Did they further have discussions about getting other

1  contracts for Victim One if he cooperated with them?

2  A.   Yes, they did.   They talked -- they mentioned a

3  contract with the Massachusetts Turnpike.

4  Q.   Now, did Victim One respond positively and agree to

5  make these payments on October 30th of 2013?

6  A.   No, he did not.

7  Q.   What happened when he said he didn't want to pay?

8  A.   They got angry at him, because he did not agree to make

9  the payments.   They mentioned you give me a number.   At that

10  point he refused to give a number.

11  Q.   What do you mean, "You give me a number"?

12  A.   That's referring to the amount of money that they were

13  going to pay him in street tax per month or per week,

14  depending on when the payments were.

15  Q.   And when Victim No. 1 refused to give a number to Ralph

16  Santaniello and John Calabrese, what happened?

17  A.   That's when Ralph Santaniello slapped him in the head.

18  Q.   Was that slap before or after Ralph Santaniello

19  threatened to cut off his head and bury his body in the back

20  yard?

21  A.   I don't recall whether it was before or after.

22  Q.   After being slapped by Ralph Santaniello, what did --

23  did Victim One agree to make payments?

24  A.   Yes, he did.

25  Q.   Was there any discussion between Victim One and John

Zanolli - Direct by Shelvey

1  Calabrese and Ralph Santaniello about what would happen in

2  going to the police?

3  A.   Yes.   They warned him not to go to law enforcement.

4  Q.   And the following morning what did Victim One do?

5  A.   He went to the police.

6  Q.   And up and until this indictment, was this information

7  made public?

8  A.   No, it was not.

9  Q.   About Victim One's cooperation?

10  A.   No, it was not.

11  Q.   And initially when Victim One met with law enforcement,

12  did he have any concerns?

13  A.   Yes, he had concerns for his safety.

14  Q.   Why was this?

15  A.   Well, he knows that these defendants here are

16  associates of organized crime, and that they have a

17  propensity for violence; and therefore, he was -- he had

18  concern for his safety.

19  Q.   Is that the information he expressed to the law

20  enforcement as to why he wanted to work with them?

21  A.   Yes.

22  Q.   Now, on October 4th of 2013 did law enforcement arrange

23  a payment to be made through Victim One?

24  A.   Yes, they did.

25  Q.   Where was that payment arranged to happen?

Zanolli - Direct by Shelvey

25

1  A.    That payment was arranged to happen at his residence in

2  Hampden, Massachusetts.

3  Q.    And again, this payment was the one he agreed to on

4  September 30?

5  A.    Yes, correct.

6  Q.    When you say agreed to, did he agree to it voluntarily?

7  A.    No, he did not.

8  Q.    Now, at the time that these --

9        At the time that this payment was to occur in Hampden,

10 Mass., did Victim No. 1 agree to wear a recording device or

11 wires?

12 A.    Yes.  Yes, he did.

13 Q.    And was law enforcement on the property in the premises

14 at the time that this payment took place?

15 A.    Yes, they were.

16 Q.    Do you know whether or not there were recordings of

17 this payment?

18 A.    There were several recordings made during this payment.

19 Q.    When you say several, why is that?

20 A.    Several -- there's some devices we can just capture

21 audio.  There's some devices where you can catch audio and

22 video.  There are times when devices fail or malfunction; so

23 therefore, several devices were used.

24 Q.    So law enforcement was utilizing various electronic

25 methods to record these interactions?

02449

1  A.   Yes, that's correct.

2         MR. SHELVEY:  Your Honor, may I approach the

3  witness?

4         THE COURT:  Yes.

5  Q.   Sir, I'm going to show you what's been marked as

6  Government's Exhibit 2A, 2B and 2C.  I'm going to ask you to

7  take a quick look at those.

8       And do you recognize those?

9  A.   Yes, I do.

10 Q.   And what are 2A and 2B?

11 A.   2A is a -- I'm sorry.

12      2B did a transcript of the recording that was completed

13 on October 4, 2013.

14 Q.   I'm going to direct your attention to the letters.

15 A.   I'm sorry.

16 Q.   2A and 2B, what are they?

17 A.   Okay.  2A and 2B are DVD disks of the surveillance, the

18 video audio surveillance that was completed on October 4,

19 2013.

20 Q.   And what is 2C?

21 A.   Exhibit 2C is a transcript of the recording that was

22 completed on October 4, 2013.

23        MR. SHELVEY:  Your Honor, I did not a provide a

24 copy to the Court.  I have an extra copy if the Court wants

25 those.

Zanolli - Direct by Shelvey

27

1          THE COURT:  The disks.  You're going to play the

2 disks?

3          MR. SHELVEY:  Yes.

4          THE COURT:  We'll be in touch with -- Ms. Calderon

5 will be touch with the U.S. Attorney's Office -- if we're

6 not able to hear on our recording what's the contents of the

7 disk, we'll be in touch with the U.S. Attorney's Office

8 through the clerk's office and ask for copies.

9          Have the defendants been provided with copies of

10 the disks?

11          MR. SHELVEY:  Yes, they have.  They have copies of

12 the transcript.

13          THE COURT:  Of the transcript.  Okay.  Mr.

14 Olanoff?

15          MR. OLANOFF:  Your Honor, no objection to the

16 disks coming in, but this transcript --

17          THE COURT:  The transcript?

18          MR. OLANOFF:  -- includes statements that they say

19 are attributed to my client, Mr. Valentini, that he never

20 said.  And so I don't think that transcript is very

21 accurate, so I would ask that it not be introduced.

22          MR. SHELVEY:  Your Honor, as it relates to the

23 October 4, there's -- Mr. Valentini was present.  We'll play

24 the transcripts.

25          THE COURT:  All right.  So there's an objection to

02451

1  the admission of the transcript, but no objection to the

2  admission of the disks.

3          MR. OLANOFF:  Yes, Your Honor.

4          THE COURT:  All right.  What I'll do, with respect

5  to the transcript, is I will take it *de bene*.  I'll, you

6  know, check it against the --

7          But I'm going to rely on the disks primarily.  I'm

8  going to rely on the disks.

9          MR. SHELVEY:  Thank you.  And in the interest of

10 time, Your Honor, the government was just going to use

11 portions thereof --

12         THE COURT:  Yes.  But we're admitting the entire

13 disk.

14         MR. SHELVEY:  Yes.

15         THE COURT:  Okay.  And you're going to play

16 portions of it?

17         MR. SHELVEY:  Yes.

18         THE COURT:  All right.

19 BY MS. SHELVEY:

20 Q.  Special Agent Zanolli, as it relates to the transcripts

21 themselves, are these court certified transcripts?

22 A.  No, they're not.

23 Q.  Who did the transcriptions?

24 A.  The transcriptions were completed by support personnel

25 at the FBI.

Zanolli - Direct by Shelvey

1  Q.    Did you have an opportunity to compare the disks to the

2  transcript?

3  A.    Yes, I did.

4  Q.    And in an effort to make it as clear as possible?

5  A.    Yes, I did.

6  Q.    Now, again, Government's Exhibit 2A, for the record,

7  we're going to be starting --

8        (Pause in the proceedings.)

9  Q.    Special Agent Zanolli, while they're doing that, for

10 the record, 2A, which device is being utilized?

11 A.    That would be a handheld device.

12 Q.    Can you explain what the handheld device is?

13 A.    Yes.  A handheld device is the device that was used by

14 a member of law enforcement that was located on the

15 property.

16 Q.    So it was actually law enforcement making recordings?

17 A.    Correct.

18       (Pause in the proceedings.)

19 Q.    While we're working on that, I'm just going to ask some

20 questions about this actual interaction.

21       MR. O'REGAN:  Here it is.

22 (Recording played and stopped.)

23 Q.    Okay, sir.  I'm going to ask you to draw your attention

24 to the video screen.

25       First of all, if you could, can you please identify the

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

Zanolli - Direct by Shelvey

30

1 individuals who are depicted?

2 A.    Yes.   The individual on the left with the sunglasses

3 and the black had with the emblem on it, that's John

4 Calabrese who's sitting in the jury box third from the left.

5      On the right side, the gentleman facing you is Richard

6 Valentini, and then the person with his back toward us is

7 Victim No. 1.

8 Q.    I'm going to switch, if we could, to Government's

9 Exhibit 2B.   I show you government's Exhibit 2B again, and

10 without describing too much detail of the device, what is

11 that?

12 A.    Yes.   That's a device -- a recording device that was

13 used during that meeting.

14 Q.    As it relates to Government's Exhibit 2B, is it easier

15 to understand the conversations on 2B versus 2A?

16 A.    Yes, it is.

17 Q.    However, is the picture or the images better on 2A?

18 A.    It's better on 2A, correct.

19 Q.    And for the record, we're going to start this at

20 approximately 2 minutes and 25 seconds, and we're going to

21 play about a minute and 5 seconds.

22      (Recording played and stopped.)

23           MR. SHELVEY:   Can you pause for a second?

24 Q.    Who's speaking right now?

25 A.    That is going to be Victim One is speaking now.

02454

1  Q.   Thank you.

2        (Recording played and stopped.)

3             MR. SHELVEY:   Just of stop for a moment there.

4  Q.   Who's speaking at that --

5  A.   That is John Calabrese.

6             MR. SHELVEY:   Continue.   Thank you.

7        (Recording played and stopped.)

8             MR. SHELVEY:   Stop there.   Thank you.

9  BY MS. SHELVEY:

10 Q.   Sir, just because it's very hard to understand, what

11 are they discussing in that clip that's being played?

12 A.   During that clip they're discussing the Victim No. 1

13 giving Ralph Santaniello, John Calabrese a number, the

14 number being the amount he would agree to pay them weekly or

15 monthly as street tax.

16 Q.   Was a reference made to being slapped?

17 A.   Yes.

18 Q.   And who brought up the fact of being slapped?

19 A.   That was John Calabrese.

20 Q.   Talking to John Calabrese?

21 A.   I'm sorry.   Correction.   The victim, Victim No. 1,

22 brought up the fact that he was slapped by -- to John

23 Calabrese that he was slapped by Ralph Santaniello.

24 Q.   Now, we saw two individuals there.

25      Does Richard Valentini speak during this interaction?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

1  A.    Almost not at all.  Very little.

2  Q.    Why was he there?

3  A.    We believe he was there to show as a muscle, to be

4  intimidating to Victim No. 1.

5  Q.    Was there something based on your investigation that

6  led you to believe that Richard Valentini was being utilized

7  by Ralph Santaniello and John Calabrese as the muscle?

8  A.    Yes.

9  Q.    And can you describe a little about what that was?

10  A.    It's information in the investigation.  Because of the

11  fact that he showed up at the meetings, he did not have --

12  he did not talk, he did not lay down the rules, he wasn't a

13  part of it.  He just stood there and basically stared at the

14  Victim No. 1.

15  Q.    And was there a previous investigation in 2005 done by

16  the State Police where Mr. Valentini was utilized in that

17  capacity, as well?

18  A.    Yes, I believe so.

19  Q.    And he was subsequently convicted of that with Mr.

20  Santaniello as his co-defendant?

21  A.    Yes.

22          MR. KELLY:  Your Honor, I would object to that

23  coming in.  That was just way too vague, and there was an

24  inference there that he was involved in some sort of

25  violence, and there was no such allegation of that, I don't

Zanolli - Direct by Shelvey

33

1 think, that night.

2        THE COURT: Yeah. I'm going to strike that.

3 BY MS. SHELVEY:

4 Q. Sir, I want to direct your attention to October 9th of

5 2013.

6     Was there an arrangement made again to audio and video

7 record the payment?

8 A. Yes, there was.

9 Q. And how much was that payment supposed to be?

10 A. For 5,000 -- the payment was supposed to be for $5,000.

11 Q. And where was that payment to take place?

12 A. That was -- I believe it was supposed to be at the

13 Victim No. 1's residence again.

14 Q. And on October 9th of 2013 did someone arrive at the

15 Victim No. 1's residence?

16 A. Yes. John Calabrese arrived at the victim's residence.

17 Q. Did the Victim No. 1 and Mr. Calabrese have

18 discussions?

19 A. Yes, they did.

20 Q. Was a payment made to Mr. Calabrese on that day?

21 A. Yes. A payment was made in the amount of $500, not the

22 $5,000 that was agreed upon.

23 Q. How did Mr. Calabrese react to that?

24 A. He didn't take it well. He was angry about the fact

25 that he did not pay the full amount as promised in the

02457

Zanolli - Direct by Shelvey

34

1  agreement.

2  Q.   And did he have a discussion about Victim No. 1 having

3  to talk to somebody about this?

4  A.   Can you repeat the question?

5  Q.   Was there a discussion about the fact that Victim No. 1

6  would then have to speak to somebody else about the fact

7  that nothing was being paid under the arrangements?

8  A.   Yes.  Victim No. 1 wanted to verify that somebody

9  legitimate was giving the order for him to pay a certain

10  amount of street tax.

11  Q.   And what was Mr. Calabrese's reaction to that?

12  A.   Repeat the question?

13  Q.   How did Mr. Calabrese react to that?

14  A.   Not well.  He didn't like it.  Anytime that Victim No.

15  1 pushed back or questioned Mr. Calabrese, Mr. Calabrese

16  appeared to get angry.

17  Q.   I'm going to show you what's been marked Government's

18  Exhibits 3A, 3B and 3C, and ask you if you recognize what

19  those are?

20  A.   Yes, I do.

21  Q.   What do you recognize those to be?

22  A.   Exhibits 3A and 3B are both DVD disks.  They're copies

23  from the original law enforcement file.

24      Exhibit 3C is a transcription from October 9, 2013,

25  involving Victim One, Ralph Santaniello and John Calabrese.

02458

Zanolli - Direct by Shelvey

35

1 Q.   You mentioned Ralph Santaniello.  How did he get

2 involved in this payment?

3 A.   There was an initial meeting, the second meeting.  John

4 Calabrese came back with Ralph Santaniello.  Drove back to

5 the Victim One's house.

6 Q.   Why did John Calabrese come back to Victim One's house

7 with Mr. Santaniello?

8 A.   We believe that he came back, because Ralph was

9 supposed to verify.  He was supposed to be the guy that was

10 supposed to verify that the payments were authorized to be

11 made.

12 Q.   Was Mr. Calabrese and Mr. Santaniello, were they upset

13 about the fact that the $5,000 had not been paid as

14 previously arranged?

15 A.   Yes, they were.

16 Q.   Was law enforcement present at the property when this

17 incident took place?

18 A.   Yes, they were.

19 Q.   Did something unusual happen when Mr. Santaniello

20 showed up?

21 A.   Yes, it did.

22 Q.   Can you explain what that was?

23 A.   When Mr. Santaniello and Mr. Calabrese arrived in a red

24 Buick, they immediately got out of the vehicle.  They

25 approached Victim No. 1, and Ralph Santaniello looked at a

02459

Zanolli - Direct by Shelvey

36

1 trailer that was set in the background, a construction

2 trailer.  He immediately said, "What's that?," and

3 immediately approached -- walked quickly up to the trailer

4 at that time.

5 Q.   Was there somebody or persons in the trailer?

6 A.   Yes, there was.  There was two persons in the trailer.

7 Q.   And who was in trailer?

8 A.   They were two members of law enforcement that were

9 acting in an undercover capacity.

10 Q.   Did Mr. Santaniello confront those two individuals?

11 A.   Yes, he did.

12 Q.   Did those two individuals, were they dressed as members

13 of law enforcement?

14 A.   No, they were not.

15 Q.   How were they dressed?

16 A.   They were dressed as members of the victim's business,

17 part of his crew.

18        MR. SHELVEY:  I'm going to play a portion of

19 Government's Exhibit 3A.

20 Q.   First, as we begin this, can you describe what's

21 depicted on Government's Exhibit 3A?

22 A.   Yes.  This is a -- this depicts a picture of the victim

23 -- Victim One's property and his work truck at the site.

24 Q.   What device is this recording from?

25 A.   This is being recorded from a handheld device that was

02460

1 in the construction trailer at the top of the hill.

2 Q.   Who was making this recording?

3 A.   Law enforcement was making the recording.

4 Q.   Are these the members of law enforcement that Mr.

5 Santaniello encountered in the --

6 A.   Yes, that's correct.

7        MR. SHELVEY:  Would you play this, please?

8      (Recording played and stopped.)

9        MR. SHELVEY:  I apologize, Your Honor.  For the

10 record, we're going to start this at 2 minutes -- excuse me

11 -- at 1, 30 and end at 2, 44.

12        THE COURT:  And is this Exhibit 3A?

13        MR. SHELVEY:  Yes, Your Honor.

14        THE COURT:  Thank you.

15      (Recording played and stopped.)

16 BY MS. SHELVEY:

17 Q.   Sir, who's pulling up in that car right now?

18 A.   That is Ralph Santaniello's car.  He just exited the

19 driver's seat.  He's wearing the black Puma sweat outfit --

20 sweatshirt, hoody.

21      Next to him on the left side is John Calabrese.  He's

22 also wearing a black hooded sweatshirt, as well.

23 Q.   And is that the same outfit that John Calabrese was

24 wearing previously when he came to collect the $5,000

25 initially?

Zanolli - Direct by Shelvey

38

1  A.    I don't believe so.

2  Q.    What was he wearing when he collected the $5,000

3  initially?

4  A.    Initially when he showed up, John Calabrese was wearing

5  his work shirt, Braman Chemical work shirt with his name

6  "John" on the chest.

7  Q.    And what was he driving?

8  A.    John Calabrese was driving a Braman Chemical truck, the

9  vehicle that he used with Victim One and Victim Two.

10 Q.    And as he came back on October 9th of 2013 with

11 Defendant Santaniello, was he driving that vehicle?

12 A.    Yes.

13 Q.    Was he driving the work truck?

14 A.    Yes.   John Calabrese was driving the work truck.

15        MR. SHELVEY:   If you could press play, please?

16    (Recording played and stopped.)

17        MR. SHELVEY:   Can you pause for a moment?

18 Q.    Where was Mr. Santaniello pointing to?

19 A.    Mr. Santaniello at that point he was pointing to the

20 construction trailer that was set up on the hill a ways

21 away.

22 Q.    And as he started walking in that direction, can you

23 tell Her Honor what's going on right now?

24 A.    Yes.   Members of law enforcement at that time are

25 trying to cover up the recording camera pretty quickly.

Zanolli - Direct by Shelvey

39

1       (Recording played and stopped.)

2           MR. SHELVEY:  If we can stop for a moment there?

3  Q.   The individuals that are speaking Spanish, who are

4  they?

5  A.   They are the law enforcement officers.  They're in the

6  trailer.

7  Q.   Where were they concealed within the trailer once Mr.

8  Santaniello came and approached?

9  A.   They were concealed in the center part of the trailer.

10 Q.   Was one individual in the bathroom?

11 A.   Yes.  One was.

12 Q.   Did Mr. Santaniello make any attempts to see if anyone

13 was in the bathroom?

14 A.   No, I don't believe so.

15          MR. SHELVEY:  If you can go further?

16      (Recording played and stopped.)

17 Q.   What happened after Mr. Santaniello left the trailer?

18 A.   As soon as Mr. Santaniello left the trailer, they were

19 pulling the camera back out to set it up to try to capture

20 the meeting.

21 Q.   Were there issues then for the recording because of the

22 audio?

23 A.   Yes.  While they reset up the camera, they apparently

24 forgot to turn the audio on on the camera at that time.

25 Q.   Now, I'm going to show you Government's Exhibit 3B, and

02463

Zanolli - Direct by Shelvey

1  what is that?

2  A.   Yes.   This is a recording with Device No. 1, October

3  9th of 2013, Exhibit 3B.

4  Q.   Is this the incident but just from another recording

5  device?

6  A.   Yes, that's correct.

7           MR. SHELVEY:   For the record, we're going to begin

8  this at 8 minutes and 2 seconds and end at 11, 25.

9       (Recording played and stopped.)

10          MR. SHELVEY:   Can you stop there?

11 Q.   I want to just identify some of the voices.   The last

12 comment we heard was someone saying "You've got to stop

13 F-ing around."   Who was the individual that said that?

14 A.   That was John Calabrese.

15 Q.   And the other individual that made the comments first,

16 "Okay.   Listen to me.   I'm going to apologize for what

17 happened.   Right?"   Who was that?

18 A.   That was Ralph Santaniello.

19 Q.   What was he apologizing for?

20 A.   He was apologizing for slapping him on the initial --

21          THE COURT:   Yeah --

22          MR. KELLY:   Objection.

23          THE COURT:   Yeah, strike that.   That's

24 speculative.

25          MR. SHELVEY:   Can I have a moment, Your Honor?

Zanolli - Direct by Shelvey

41

1       THE COURT:  Yes.

2  Q.  Sir, in listening to this whole tape, and there was

3  just obviously an objection about speculative, did you have

4  an opportunity to listen to this whole conversation?

5  A.  Yes, I have.

6  Q.  And what did the conversation revolve around?

7  A.  The conversation revolved around the Victim No. 1 not

8  paying the amount that he agreed to pay.

9     The other part of that was the concern that there was

10 somebody -- namely, law enforcement -- that was there on the

11 property, and that possibly Victim One was recording what

12 was happening.

13 Q.  And as it relates to --

14       ATTORNEY:  I'm sorry.  I'm going to cut you off.

15       Your Honor, I'm going to object to that last part

16 about law enforcement potentially being there.  Again, I

17 didn't hear that at all.

18       THE COURT:  I heard references to a rat.

19       MR. SHELVEY:  Your Honor, if counsel wants to play

20 -- we're going to get to this in just a moment.  As an offer

21 of proof, the beginning of it -- and that was the next

22 exhibit I guess.  We're going to show you exhibit -- perhaps

23 that there resolve things.

24 Q.  Sir, I'm going to show you Exhibit No. 4 and ask you if

25 you recognize that?

02465

Zanolli - Direct by Shelvey

42

1          THE COURT:  Yeah.

2   Q.   Sir, can you describe what's being depicted in Exhibit

3   No. 4?

4   A.   Yes.

5          THE COURT:  Have we -- okay.  We can't publish

6   until it's admitted.  We can't show it to everybody.  So

7   let's ask him if he can recognize it, lay the foundation of

8   its admissibility, and then we can put it up.

9   Q.   I'm going to show you Government's Exhibit 4.  Do you

10  recognize that?

11  A.   Yes, I do.

12  Q.   And what do you recognize that to be?

13  A.   This is a surveillance photograph of October 9, 2013,

14  depicting Ralph Santaniello's car, Victim No. 1 with his

15  shirt open, Ralph Santaniello standing directly in front of

16  him, and John Calabrese in the black hooded sweatshirt

17  standing directly behind Ralph Santaniello.

18         THE COURT:  All right.  So we're going to admit

19  that as Exhibit 4?

20         MR. SHELVEY:  Yes, Your Honor.

21         THE COURT:  Yep.

22    GOVERNMENT EXHIBIT NO. 4, ADMITTED

23  BY MS. SHELVEY:

24  Q.   Are you able to identify who these individuals are as

25  it relates to this investigation?

02466

1  A.    Yes, I was.

2  Q.    And who are the individuals?  Who are they depicted?

3  A.    Again, the individual closest to us in the open shirt,

4  it's a plaid shirt, is Victim No. 1 with his back toward us.

5  Directly in front of him in dark-colored clothing is Ralph

6  Santaniello.  Behind him in the background is -- facing us

7  is John Calabrese who's wearing a black hooded sweatshirt.

8  Q.    And in these videos are you able to hear what is going

9  on as we get into this photograph?

10 A.    Yes, we are.

11 Q.    In Exhibit 3B.

12        (Recording played and stopped.)

13        MR. SHELVEY:  Can you stop it there?

14 Q.    What's happening in that when Victim No. 1 says, "I'm

15 not going, Ralph.  We're good here"?

16 A.    At that time Ralph Santaniello is trying to draw him

17 away from the trailer, away from where he just went up to

18 the hill.  John Calabrese is on the side there in the black

19 hooded sweatshirt.  He's identified.  Mr. Santaniello is

20 identified by Victim No. 1.  Victim No. 1 at some point

21 says, "This is far enough."  Victim One appeared afraid for

22 his safety that he was trying to be drawn down into the

23 wooded area on property.

24 Q.    And as it relates to Mr. Santaniello, did he request

25 Victim One do anything with his cell phone?

02467

Zanolli - Direct by Shelvey

44

1  A.   Yes.

2  Q.   And what was that?

3  A.   He asked him if he had a cell phone and to leave the

4  cell phone away from where they were meeting.

5         MR. SHELVEY:  If we can play that portion, please?

6      (Recording played.)

7         MR. SHELVEY:  You can just play it through.

8  Q.   Is this the other angle from what we just saw in

9  Government's Exhibit 3A?

10  A.   Yes, it is.

11  Q.   Who is with Victim One while Mr. Santaniello goes up to

12  the shed?

13  A.   John Calabrese.

14         MR. SHELVEY:  Please stop right there.

15      (Recording stopped.)

16  Q.   And is that the conversation you just made reference

17  to?  Who says, "Come on.  Let's take a walk"?

18  A.   That's Ralph Santaniello.

19  Q.   And who asked, "Do you have your phone on you"?

20  A.   That's also Ralph Santaniello.

21         MR. SHELVEY:  Continue playing.

22      (Recording played and stopped)

23         MR. SHELVEY:  If we can stop right there?

24  Q.   Who says, "Do you have anything on you?"

25  A.   Ralph Santaniello.

02468

Zanolli - Direct by Shelvey

1  Q.   And what happens after that?

2  A.   At that time he ripped his shirt open to check him for

3  a recording device or a wire.

4            MR. SHELVEY:  You can continue, please.

5        (Recording played and stopped)

6            MR. SHELVEY:  If you can stop.

7  Q.   And going back to the initial clip that we played prior

8  to counsel's objection, who made the comment, "I'm going to

9  be nice before I blow up again, and I don't want to do

10 that"?

11 A.   That was Ralph Santaniello.

12           MR. SHELVEY:  Your Honor, I'd move to admit

13 Government's Exhibits 2A, B, and C and 3A, B and C.

14           THE COURT:  C is the transcripts; is that correct?

15 I'm certainly going to admit the disks.  I'm going to take

16 the transcripts subject to --

17           At least there's an objection to 2C.  I haven't

18 heard an objection to 3C, so I'll admit 3C.

19           I'm going to take 2C subject to review of whether

20 or not it appears to me that it accurately reflects the

21 contents of the disks, but I'm going to rely primarily on

22 the disks.

23           MR. SHELVEY:  Thank you, Your Honor.

24      GOVERNMENT EXHIBIT NOs. 2A, 2B, 2C, 3A, 3B, 3C,

25 ADMITTED

Zanolli - Direct by Shelvey

46

1  BY MS. SHELVEY:

2  Q.    Sir, I want to direct your attention now to October

3  16th of 2013.

4        Was that a payment or discussion?

5  A.    That meeting was a discussion.

6  Q.    And who was the discussion between?

7  A.    The discussion was between Frank Depergola and Victim

8  No. 1.

9  Q.    And where did the discussion between Frank Depergola

10  and Victim No. 1 take place?

11  A.    The conversation took place in front of Frank

12  Depergola's residence, which is 32 Winthrop Street,

13  Springfield.

14  Q.    I'm going to show you what's been marked as

15  Government's Exhibit 5A and 5B.

16        Do you recognize those exhibits?

17  A.    Yes, I do.

18  Q.    What do you recognize those to be?

19  A.    Exhibit 5A is a DVD copy from the law enforcement file

20  of a recording completed.  Exhibit 5B is going to be a copy

21  of the transcript from that recording.

22  Q.    What device was being utilized for Exhibit 5A?

23  A.    The device being used on October 16, 2001, was device

24  No. 2.

25  Q.    Is that different than the previous device?

*Judy Bond*
Certified Federal Court Transcriber
508.984.7003

Zanolli – Direct by Shelvey

47

1  A.   Yes, correct.

2  Q.   What was the purpose of this discussion between Victim

3  No. 1 and Frank Depergola?

4  A.   The discussion was again to discuss the street tax that

5  Victim No. 1 was supposed to pay.

6  Q.   And prior to Victim No. 1 meeting with Frank Depergola,

7  based on conversations with law enforcement and Victim No.

8  1, who was supposed to be attending that meeting?

9  A.   It was just supposed to be Victim No. 1 and Frank

10  Depergola.

11  Q.   And at some point in time did other individuals join

12  the discussion?

13  A.   Yes.  Later during the meeting Ralph Santaniello and

14  John Calabrese showed up for the meeting.

15  Q.   Did that surprise law enforcement?

16  A.   Yes, it did.

17  Q.   Did that surprise Victim No. 1?

18  A.   Certainly.

19       MR. SHELVEY:  Again, for the record if we can play

20  starting at 7 minutes and ending at about 7, 45, please, a

21  portion of this.

22       THE COURT:  Yeah, I'm going to admit this as an

23  exhibit before we play it.

24       MR. SHELVEY:  Thank you, Your Honor.

25       THE COURT:  So.

02471

1        GOVERNMENT EXHIBIT NO. 5A, MARKED

2        (Recording played and stopped.)

3            MS. SHELVEY: I want to stop there.

4    BY MS. SHELVEY:

5    Q.   Just for reference, who is the individual first that's

6    depicted the lower half of the body?

7    A.   That person is Frank Depergola.

8    Q.   And that's the individual that was speaking just now?

9    A.   Yes, that's correct.

10   Q.   Thank you.

11       (Recording played and stopped.)

12           MR. SHELVEY: Please stop there for a moment.

13   Q.   Now, who is that voice that was speaking?

14   A.   That was Ralph Santaniello.

15   Q.   And who made the comment, "See, when you talk like

16   that, you're going to get your F-ing head cracked"?

17   A.   That's Ralph Santaniello.

18   Q.   And what was that comment in relation to?

19   A.   That's in relation to Victim No. 1 not giving him a

20   number and confirming the amount he's going to pay him in

21   street tax.

22   Q.   Was Victim No. 1 disagreeing with the fact that he

23   agreed to these payments?

24   A.   Yes.

25           MR. SHELVEY: We can continue playing, please.

*Judy Bond*
Certified Federal Court Transcriber
508.984.7003

1    (Recording played and stopped.)

2         MR. SHELVEY:  I want to stop there.

3 Q.  Who's that individual?

4         MR. SHELVEY:  Or if we can back up?

5    (Recording played.)

6 A.  That is John Calabrese.

7    (Recording stopped.)

8         MR. SHELVEY:  Yes.  Thank you.  Continue, please.

9    (Recording played and stopped.)

10        MR. SHELVEY:  I want to stop here.

11 Q.  What are they discussing at this point in time?

12 A.  They're talking about the street tax.

13 Q.  And as it relates to getting what types of things for

14 Victim No. 1?

15 A.  Contracts.

16 Q.  Thank you.

17        MR. SHELVEY:  Your Honor, again, I would move to

18 admit Government's Exhibit 5B which is the transcript

19 subject to your --

20        THE COURT:  Yeah.  Is there an objection from any

21 of the defendants to the admission of 5B, which is

22 apparently a transcript of 5A?

23        ATTORNEY:  Just to the extent that it doesn't

24 match up, Your Honor.  I don't mean to play the entire

25 thing, but I'd leave it to the Court's --

02473

1          THE COURT:  Yeah, so again, I won't rely -- I'm

2 going to rely primarily on the DVD.  If I don't hear it on

3 the DVD, I'm not going to rely on the portion of the

4 transcript that you -- you know, that I can't match up to

5 the DVD.

6          MR. SHELVEY:  Thank you.

7      GOVERNMENT EXHIBIT NO. 5B, ADMITTED

8 BY MS. SHELVEY:

9 Q.   Sir, I'm going to direct your attention to October 22nd

10 of 2013.  Was there a discussion between Victim No. 1 and

11 Frank Depergola?

12 A.   Yes, there was.

13 Q.   Where did that conversation take place?

14 A.   That took place at Frank Depergola's business, an auto

15 sales place.

16          MR. SHELVEY:  I apologize, Your Honor.  I have not

17 been asking for permission to approach.  May I approach?

18          THE COURT:  Yes.  Yes, please.

19 Q.   I show you Government's Exhibit 6 and ask you if you

20 recognize that?

21 A.   Yes, I do.

22 Q.   What do you recognize that to be?

23 A.   That is a DVD of the recording done on October 22,

24 2013.  It's copy from the official law enforcement file.

25 Q.   And what device is that?

1   A.   That is Device No. 2.

2           THE COURT:  And are you moving for its admission

3   on that basis?

4           MR. SHELVEY:  Yes, I am.

5           THE COURT:  All right.  It will be admitted.

6       GOVERNMENT EXHIBIT NO. 6, ADMITTED

7   BY MS. SHELVEY:

8   Q.   Where did this discussion take place between Frank

9   Depergola and Victim No. 1?

10  A.   At Frank Depergola's business.

11  Q.   And what was the purpose of the meeting between Frank

12  Depergola and Victim No. 1?

13  A.   The purpose is for the Victim No. 1 to find out what's

14  going to happen if I don't pay.

15          MR. SHELVEY:  And for the record, we can just play

16  a small portion starting at 21 minutes and 58 seconds and

17  ending at 22 minutes and 4 seconds.

18      (Recording played and stopped.)

19          MR. SHELVEY:  We can stop it.

20  Q.   And during this discussion who are "they" when they're

21  making reference to "they"?

22  A.   They're referring to Ralph Santaniello and John

23  Calabrese.

24  Q.   Was Mr. Depergola encouraging Victim One to make and

25  continue to make payments to those individuals?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

02475

Zanolli - Direct by Shelvey

1 A.   Yes, he was.

2         THE COURT:  Mr. O'Connor?

3         MR. O'CONNOR:  Yes, objection.  (Inaudible) was

4 Mr. Depergola was doing.

5         THE COURT:  Okay.  Again, I'm going to rely on the

6 contents of the DVD.

7         MR. SHELVEY:  Thank you, Your Honor.

8         THE COURT:  And I'm going to sustain that

9 objection.

10        MR. SHELVEY:  That's fine, Your Honor.  It speaks

11 for itself.

12 BY MS. SHELVEY:

13 Q.   And now, sir, I want to direct your attention to

14 November 20th of 2013.

15        In between October 22 and November of 2013, was an

16 agreement reached between Victim One and Defendants

17 Calabrese, Santaniello, and Depergola to a final payment

18 arrangement?

19 A.   Yes, there was.

20 Q.   Would you describe a little bit about what that was?

21 A.   The overall payment was $20,000.  There was an

22 agreement for him to pay 3,000 and then a subsequent payment

23 of 10,000.

24 Q.   And how did that arrangement come about?

25 A.   Through the meetings with Frank Depergola and Ralph

1  Santaniello and John Calabrese.

2  Q.   And once they reached a final payment of $20,000, what

3  would happen to the street tax that Victim One would be

4  required to pay?

5  A.   They said there would be no more payments.  That would

6  be the full amount he would ever have to pay.

7  Q.   I'm going to show you what's been marked as

8  Government's Exhibit 7A and 7B, and ask you if you recognize

9  that?

10  A.   Yes, I do.  Exhibit 7A is a DVD copy from the law

11  enforcement file, Device No. 1.  7B is the transcript for

12  that same date.

13  Q.   And what was the discussion on this November 20th of

14  2013?  What was the content of that discussion?

15  A.   The meeting with Victim One.  The purpose of the

16  meeting was for Victim One to make a payment, which he did,

17  to Frank Depergola in the amount of $3,000.

18          MR. SHELVEY:  Your Honor, I'd move to admit 7A and

19  7B.

20          THE COURT:  Is there any objection to the

21  admission of 7A or 7B?  Again, 7B I'm going to admit

22  conditionally to the extent that the transcript appears to

23  me to comply with the contents of the disk.

24      GOVERNMENT EXHIBIT NO. 7A & 7B, ADMITTED

25  BY MS. SHELVEY:

Zanolli - Direct by Shelvey

54

1  Q.   After the last payment of $10,000 was arranged, where

2  did that payment occur?

3  A.   That payment occurred at Frank Depergola's auto shop.

4  Q.   Who was present at Mr. Depergola's auto shop at the

5  time this last payment occurred?

6  A.   That was Frank Depergola, Ralph Santaniello, and John

7  Calabrese, and Victim One.

8  Q.   How was the $10,000 payment made?

9  A.   In cash.

10  Q.   Who actually collected the money?

11  A.   I don't recall.

12  Q.   Now, during the meetings at Mr. Depergola's business,

13  was there any types of weapons observed that caused law

14  enforcement some concern?

15  A.   Yes.  There was a video in the corner of the office

16  room where there was what appeared to be what we believed to

17  be a rifle or a shotgun, but that was never verified.

18          THE COURT:  I'm sorry.  There was a video?

19          MR. SHELVEY:  I can follow up on that, Your Honor.

20          THE COURT:  All right.

21  Q.   When you say a video, how did you come to be in

22  possession of the video seeing what appeared to be

23  consistent with some type of long gun?

24  A.   That was provided by the victim who was outfitted with

25  a recorder and video equipment.

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

02478

Zanolli - Direct by Shelvey

55

1 Q.   When Victim No. 1 went to meet with Mr. Depergola to

2 make a payment, is that when he observed the firearm?

3 A.   Yes.

4 Q.   Or what appeared to be a firearm?

5 A.   That's correct.

6 Q.   When you say what appeared to, was any effort ever made

7 to go to Mr. Depergola's business to locate that gun?

8 A.   No, it wasn't.

9 Q.   Why not?

10 A.   We weren't able to verify it was a working firearm, and

11 also believed that it would jeopardize the entire

12 investigation to do a search warrant at that time.

13 Q.   I want to move forward to the spring of 2015.

14      Did you have an opportunity in or about July 2015 to

15 come in contact with another individual identified as Victim

16 No. 2?

17 A.   Yes, I did.

18 Q.   Can you describe how you came in contact with Victim

19 No. 2?

20 A.   Victim No. 2 initially came to the Massachusetts State

21 Police Special Services Section to make a complaint that he

22 was being extorted by members of organized crime,

23 specifically the Genovese crime family.

24 Q.   And did he explain to you a little bit about how he

25 came to be in contact with these individuals?

02479

1  A.    Yes, he did.

2  Q.    And how did he come to be in contact with these

3  individuals?

4  A.    Victim No. 2 explained that he had a long history with

5  Gerald Daniele, had grown up with him and gone to school

6  with him.

7  Q.    And the individual he identified as Gerald Daniele, do

8  you see him here in court today?

9  A.    Yes, I do.

10  Q.    Would you please identify him for the record?

11  A.    Yes.  He's in the jury box.  He is the fifth person

12  from the left.

13        MR. SHELVEY:  Your Honor, may the record reflect

14  identification of Gerald Daniele?

15        THE COURT:  Yes.

16  Q.    Can you describe a little bit about the relationship

17  between Victim No. 2 and Gerald Daniele, their history or

18  how they knew each other?

19  A.    Yes.  They grew up together, they went to school

20  together, they've known each other for quite a long time.

21        MR. ENTIN:  Judge, I'm going to object to his

22  narrative.  I would ask that he --

23        THE COURT:  This is what the --

24        MR. ENTIN:  What the alleged victim to say --

25        THE COURT:  Said.

02480

Zanolli - Direct by Shelvey

57

1          MR. ENTIN:  To him did.

2          THE COURT:  About --

3          MR. KELLY:  Rather than his summation of what he

4  believes.

5          THE COURT:  Yeah.  To the extent that you recall,

6  what did Victim No. 2, the person we're referring to as

7  Victim No. 2, tell law enforcement about his relationship

8  with Mr. Daniele.

9          THE WITNESS:  He said he grew up with him and he

10  went to school with him.

11  BY MS. SHELVEY:

12  Q.   Did he provide any specific instances where he was

13  present with Mr. Daniele when criminal acts occurred?

14  A.   Yes, he did.

15  Q.   And just as we're relaying these, these are all

16  recitations that Victim No. 2 told you?

17  A.   Yes, exactly.

18  Q.   Was there an incident that Victim No. 2 and Mr. Daniele

19  were arrested together?

20  A.   Yes.

21  Q.   Can you explain a little bit about that to the Court?

22  A.   Yes.  Mr. Daniele and Victim No. 2 traveled to

23  California --

24          MR. ENTIN:  Again, Your Honor, I would object.  Is

25  this based solely on what he told him or a collection of

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

02481

1 information that he has?

2        THE COURT:  That my understanding is -- and you

3 can correct me if I'm wrong.  My understanding is that the

4 agent is testifying to what Victim No. 2 told him about what

5 he and Mr. Daniele did.

6        MR. ENTIN:  Thank you.

7        THE COURT:  Correct?

8        THE WITNESS:  Yes, Your Honor.  This is what

9 Victim No. 2 told investigators.

10        THE COURT:  Right.  Proceed.

11 A.   Mr. Daniele and Victim No. 2 traveled to California.

12 At some point during that trip they had ordered a couple --

13 two prostitutes.  Two prostitutes were in the room at some

14 point during their meeting.  They saw a large bundle of cash

15 on the bedside table.

16 BY MS. SHELVEY:

17 Q.   I want to stop.  Who did Victim No. 2 identify that

18 that large amount of cash belonged to?

19 A.   It belonged to Gerald Daniele.

20 Q.   Was there a third individual --

21       Did Victim No. 2 tell that you there was a third

22 individual in the room?

23 A.   Yes, there was.

24 Q.   And so the prostitutes were for the third individual

25 and Mr. Daniele?

Zanolli - Direct by Shelvey

59

1 A.   Yes, correct.

2         MR. ENTIN:   Your Honor, can we get a time date

3 when this is alleged to have taken place?

4 BY MS. SHELVEY:

5 Q.   Approximately when did this take place?

6 A.   I don't recall the exact date.   I believe 2007 or

7 thereabouts.

8 Q.   Would looking at Mr. Daniele's criminal history help

9 you --

10 A.   Yes, it would.

11         MR. SHELVEY:   Can I just have a moment, Your

12 Honor?   May I approach?

13         THE COURT:   Yes.

14 Q.   Sir, looking at that, does that refresh your

15 recollection as to the time frame we're talking about?

16 A.   Yes, it does.

17 Q.   And when did this incident occur?

18 A.   It was October 2009.

19 Q.   Do you remember what day?

20 A.   27th.

21 Q.   Thank you.

22    Now, on October 27th of 2009 Mr. Daniele was with

23 Victim No. 2 and another individual?

24 A.   Yes.

25 Q.   And if you can just from that point explain what had

02483

Zanolli - Direct by Shelvey

60

1  occurred?

2  A.   Yes.   As I said, they had ordered two prostitutes to

3  the room.   One of the prostitutes had seen a large wad of

4  cash on the nightstand, and that was identified to be Mr.

5  Daniele's money.   The prostitutes grabbed the money,

6  departed the room quickly.   They were followed out by Mr.

7  Daniele and Victim Two and the other individual.

8       Outside the room there were two other males, unknown

9  males, that were associates of the prostitutes.   At some

10 time later Mr. Daniele and Victim No. 2 and the other

11 individual approached these two males, beat them up and

12 recovered Mr. Daniele's money.

13      After that the law enforcement was contacted.   They

14 were called.   Mr. Daniele and the other subjects were

15 arrested for robbery in California.

16 Q.   Now, as it relates to the actual assault between Mr.

17 Daniele and one of these individuals, did Victim No. 2

18 describe to you what he observed Mr. Daniele do?

19 A.   Yes.   He said he just snapped.   He said he -- at the

20 flip of a switch.   He said he was very violent during that

21 fight.   He said he just kept beating the man.

22 Q.   Did Victim No. 2 recount to law enforcement that even

23 after the money was recovered, Mr. Daniele continued to beat

24 that individual?

25 A.   Yes, he did.

02484

1 Q. And as a result of that individual -- as a result of

2 that incident, both individuals were arrested?

3 A. Yes, they were.

4 Q. And ultimately did they plea to a lesser charge?

5 A. Yes, they did.

6      THE COURT: I'm sorry. When you say "both

7 individuals," do you mean Mr. Daniele and Victim Two?

8      MR. SHELVEY: Yes.

9      THE WITNESS: Yes.

10      THE COURT: Thank you.

11 BY MS. SHELVEY:

12 Q. Did Mr. Daniele relate to you another incident --

13 excuse me.

14      Did Victim Two relate to you another incident that he

15 was involved with with Mr. Daniele?

16 A. Yes, he did.

17 Q. And again, do you recall or did Victim Two tell you

18 about when this incident occurred?

19 A. Yes. It occurred in 2007.

20 Q. And what was that incident?

21 A. During that incident Victim Two was present. Mr.

22 Daniele went to his ex-girlfriend's residence with a pool

23 cue and baseball bat, entered the residence where his

24 ex-girlfriend was with an --

25      MR. ENTIN: I'm going to object to relevancy.

Zanolli - Direct by Shelvey

1    THE COURT:  Well, the question is dangerousness.

2    MR. ENTIN:  I understand, Your Honor.

3    THE COURT:  The question is dangerous to the

4  community or an individual, and I do think that this --

5    In my view it is relevant.  I'm going to overrule

6  the objection on grounds of relevance.

7    MR. ENTIN:  With all due respect, I know hearsay's

8  admitted, but he's just reciting what somebody told him --

9    THE COURT:  Right.

10    MR. ENTIN:  -- in 2007.

11    THE COURT:  Right.

12    MR. ENTIN:  I will not be able to cross examine,

13  and I don't think --

14    THE COURT:  But this is a dangerousness hearing,

15  and hearsay is admissible.  And so I'm going to overrule the

16  objection, and I am going -- I do deem it relevant, and I am

17  going to hear it.

18    MR. SHELVEY:  Your Honor, along those lines --

19  Q.  Did you have an opportunity to review Mr. Daniele's

20  criminal record?

21  A.   Yes, I did.

22  Q.  And as it relates to these restraining orders, were you

23  able -- or was law enforcement request made to obtain

24  certified copies of the restraining order against Mr.

25  Daniele?

02486

1  A.    Yes.

2  Q.    Approximately how many restraining orders were issued

3  against Mr. Daniele?

4  A.    More than half a dozen.

5  Q.    And did they all include the same victim?

6  A.    No.  Multiple victims.

7          MR. SHELVEY:  Your Honor, copies have been

8  provided to counsel, but at this time I would move to admit

9  Government's Exhibit A, B, C, D, E and F.

10         THE COURT:  Are these documents that have to be

11 sealed?  Are these -- no, all right.

12         MR. SHELVEY:  No, Your Honor.  These were public

13 records in the district court.

14         THE COURT:  They're public records, okay.

15         Is there any objection to their admission?

16         MR. ENTIN:  No.  I've reviewed them, Your Honor.

17 They're certified documents.

18         THE COURT:  Thank you.

19      GOVERNMENT EXHIBIT NO. 8A-8F, MARKED & ADMITTED

20 BY MS. SHELVEY:

21 Q.    Going back to Victim Two and Mr. Daniele --

22         THE COURT:  Did we admit those documents as

23 exhibits?

24         MR. SHELVEY:  I believe so.

25         THE COURT:  Okay.  And did we number them 8 -- how

02487

1 many are there?

2　　　　MR. SHELVEY:  A through F..

3　　　　THE COURT:  8A through F.

4　　　　MR. SHELVEY:  A, B, C, D, E --

5　　　　THE COURT:  I just want to make sure that Ms.

6 Calderon has -- okay.  All right.

7　　　　MR. SHELVEY:  Thank you.

8　　　　THE COURT:  Thank you.

9 BY MS. SHELVEY:

10 Q.　Now, aside from criminal involvement with Mr. Daniele,

11 did Victim No. 2 engage in other activities with him?

12 A.　Yes, he did.

13 Q.　Can you describe a little bit about that?

14 A.　He engaged in gambling and loan sharking.

15 Q.　How do you know he engaged in gambling with Mr.

16 Daniele?

17 A.　Because Mr. Daniele runs an offshore gambling site.

18 Q.　How are you able to ascertain that Mr. Daniele runs an

19 offshore gambling site?

20 A.　That was told to Victim No. 2 by -- through John

21 Calabrese.

22 Q.　Did Victim No. 2 provide law enforcement with his

23 identification and pass code to his gambling site that's run

24 by Mr. Daniele?

25 A.　Yes, he did.

02488

1           MR. SHELVEY:  Can I just have a moment, Your

2   Honor?

3   Q.    When Victim No. 2 came to law enforcement, did he

4   provide information about his history?

5   A.    Yes, he did.

6   Q.    Did he indicate whether or not he had any addiction

7   issues?

8   A.    Yes, he did.

9   Q.    What types of addictions did Victim No. 2?

10  A.    He had drug and alcohol addictions.

11  Q.    And did Victim No. 2 express to law enforcement he was

12  involved in gambling, as well?

13  A.    Yes, he did.

14  Q.    Did he explain to you how long he had been gambling

15  with Mr. Daniele?

16  A.    I don't recall.

17  Q.    I want to talk about the spring of 2015.

18        Did Victim No. 2 explain to law enforcement about a

19  loan that he took from Mr. Daniele?

20  A.    Yes, he did, in the amount of $1,000.

21  Q.    Can you explain a little bit about that?

22  A.    The loan that he received from Mr. Daniele in the

23  amount of $1,000 was attached to that was he was told he

24  would have to pay points.  And in this case it was 4 points,

25  which means he would pay $40 per week on that loan, and that

1 is just the interest or the *juice* for that loan.

2 Q.   And as part of accepting this loan from Mr. Daniele,

3 did he have to pay that $40 a week no matter what?

4 A.   Yes, no matter what.

5 Q.   What would happen if he did not pay that $40 to Mr.

6 Daniele a week?

7 A.   Victim No. 2, knowing that Mr. Daniele was violent,

8 feared for his safety; that if he didn't pay the loan, that

9 he would get beaten up by Mr. Daniele.

10 Q.   At the time he took the thousand dollar loan from Mr.

11 Daniele, where did that transaction occur?

12 A.   I don't recall.

13 Q.   Was there anyone with Mr. Daniele when the thousand

14 dollar loan was given to Victim Two?

15 A.   Yes.  Ralph Santaniello.

16 Q.   Did Victim Two begin making those $40 *juice* payments

17 per week as he was required?

18 A.   Yes, he did.

19 Q.   And was he also gambling with Mr. Daniele at that time?

20 A.   Yes, he was.

21 Q.   And in or around a few weeks later, so maybe May or

22 June of 2015, did he run into some issues in terms of losses

23 in gambling?

24 A.   Yes, he did.

25 Q.   And how much money did he owe Mr. Daniele as it related

Zanolli - Direct by Shelvey

67

1  to the gambling?

2  A.    At that time he owed Mr. Daniele a total of $3700.

3  Q.    And where did the other $2700 come from?

4  A.    $2700 came from gambling loss.  The $1,000 was from the

5  original personal loan.

6  Q.    Did a discussion happen between Mr. Daniele and Victim

7  No. 2 to renegotiate the terms of his initial $1,000 loan?

8  A.    Yes, it did.

9  Q.    And what was the outcome of that discussion?

10  A.    The outcome was the agreement was that Victim No. 2

11  would pay Mr. Daniele $100 a week or $200 every other week

12  for repayment of his loan and his gambling debt.

13  Q.    And so the total --

14       And that $100, would that be principal and interest, or

15  how was that supposed to break down?

16  A.    That was *juice* only or interest only.

17  Q.    So it was $100 a week, interest only?

18  A.    Interest only.  That did not come off the total amount

19  owed.

20  Q.    Now, did Victim No. 2 pay Mr. Daniele with those new

21  terms?

22  A.    Yes, he did.

23  Q.    Did he eventually run into problems?

24  A.    Yes, he did.

25  Q.    Did he stop paying Mr. Daniele?

02491

1  A.   Yes, he did.

2  Q.   Where was Victim Two working at the time that he was

3  gambling with Mr. Daniele?

4  A.   Victim No. 2 was working at a rehabilitation center.

5  Q.   What type of facility was this?

6  A.   It was a drug rehabilitation center.

7  Q.   And at this point in time was Victim No. 2 sober?

8  A.   Yes, he was.

9  Q.   In the process of working through --

10        MR. ENTIN:   Objection.   Speculation if he's sober

11  on any given day unless he can verify that.

12  Q.   Did you have specific discussions with Victim No. 2

13  about his sobriety?

14  A.   Yes, we did.

15  Q.   And did Victim No. 2 tell you about his sobriety?

16  A.   Yes, victim No. 2 did.

17  Q.   And in 2015 when this was going on, what did Victim No.

18  2 tell you about his sobriety?

19  A.   Victim No. 2 said that he had been involved in -- and

20  had gone meetings for Alcoholics Anonymous, Narcotics

21  Anonymous, and also became a counselor for a rehabilitation

22  services.

23  Q.   Did Victim No. 2 tell you who he attended Alcoholics

24  Anonymous with?

25  A.   Yes, he did.

02492

Zanolli - Direct by Shelvey

69

1 Q.   And who was that?

2 A.   He said he attended those meetings with John Calabrese.

3 Q.   And throughout this process did you have discussions

4 with Victim No. 2 about his sobriety?

5 A.   Yes, we did.

6 Q.   And at any time from the beginning of this

7 investigation in 2015 to --

8      When did you last see Victim No. 2?

9 A.   Victim No. 2 within the last month.

10 Q.   Did he explain to you anything about his sobriety?

11 A.   Yes.  Victim Two whenever we met him appeared not to be

12 under the influence of drugs or alcohol.

13 Q.   Did he specifically reach certain marks or talk about

14 reaching certain marks within the AA program?

15 A.   I don't recall specifically what mark he reached.  He

16 did appear sober and drug free.

17 Q.   Now, going back to his failure to pay Mr. Daniele, can

18 you describe an incident that occurred that caused Victim

19 No. 2 concern?

20 A.   Yes.  The incident was Mr. Daniele, when the Victim No.

21 2 could no longer afford to pay Mr. Daniele, Mr. Daniele

22 visited the rehabilitation center which is a locked

23 facility, made entry into that facility --

24 Q.   I want to stop.

25      When you said "made entry," was he invited by Victim

02493

1 No. 2 into the facility?

2 A.   No, he wasn't.

3 Q.   When did Victim No. 2 become aware that Mr. Daniele was

4 in the facility?

5 A.   He became aware when Mr. Daniele approached him.

6    Victim No. 2 was also contacted by his boss and

7 contacted by other members who worked in the rehabilitation

8 center.

9 Q.   Where did Mr. Daniele approach Victim No. 2?

10 A.   Inside the rehabilitation center.

11 Q.   In a locked secured area?

12 A.   Yes, that's correct.

13 Q.   And did Victim No. 2 relay to you, and what did Victim

14 No. 2 tell you about Mr. Daniele's demeanor at that time?

15 A.   Victim No. 2 said that Mr. Daniele was very angry, very

16 angry that he hadn't made any payments.  He had caused a

17 disturbance at the rehabilitation center.  He thought that

18 he was --

19    He was in fear for his life.  He thought Mr. Daniele

20 was going to do some kind of violence to him at that point.

21 Q.   Did Victim No. 2's boss intervene in that situation at

22 that time?

23 A.   Yes.

24 Q.   Did Victim No. 2 say something to Mr. Daniele that

25 caused him to leave?

1  A.   Yes, he did.

2  Q.   What did he tell him?

3  A.   Victim No. 2 told Mr. Daniele that if he ever comes to

4  his place of work again, he was going to call the cops.

5  Q.   And what did Victim No. 2 relay Mr. Daniele's reaction

6  was?

7  A.   Victim No. 2 stated that Mr. Daniele immediately left

8  the rehabilitation center at that point.

9  Q.   Was that the end of any interaction that Victim Two

10 relayed to you between he and Mr. Daniele?

11 A.   Yes.  That's correct.

12 Q.   Was that the end of the moneys owed?

13 A.   No, that wasn't.

14 Q.   What happened next?

15 A.   Victim No. 2 then met with John Calabrese who was an

16 intermediary for Mr. Daniele.

17            MR. ENTIN:  Objection.

18            THE COURT:  Objection.  That he met with Mr.

19 Calabrese.  We'll leave it at that.

20 BY MS. SHELVEY:

21 Q.   Did Mr. Calabrese --

22      Did Victim No. 2 tell you how John Calabrese introduced

23 him to Victim No. 2 on behalf of Mr. Daniele?

24            MR. ENTIN:  Leading, and calls for conclusions

25 that aren't offered.

02495

1            THE COURT:  Yeah.  Reframe the question.  She can

2   reframe.  You can definitely reframe the question.

3   BY MS. SHELVEY:

4   Q.   What did Victim No. 2 tell you about his meeting with

5   Mr. Calabrese?

6   A.   Victim No. 2 said that -- told law enforcement that he

7   would be paying his debt through -- his debt with Mr.

8   Daniele through John Calabrese.

9   Q.   Based on the discussions you had, what was Victim No.

10  2's understanding as to who he was to now pay?

11  A.   He was to pay --

12           MR. ENTIN:  Objection to his understanding.

13  A.   -- John Calabrese.

14           THE COURT:  No.  I'm going to overrule that.

15           MR. SHELVEY:  Thank you, Your Honor.

16  BY MS. SHELVEY:

17  Q.   And did Victim No. 2 and Mr. Calabrese enter into a

18  payment plan agreement?

19  A.   Yes, they did.

20  Q.   And what was that plan?

21  A.   That payment agreement was $200 every other week.

22  Q.   Did Victim No. 2 make those payments for a period of

23  time?

24  A.   Yes.  Victim No. 2 did make those payments.

25  Q.   At some point in time did the terms of the loan change?

1 A.   Yes, they did.

2 Q.   What did Victim No. 2 tell you about the changing of

3 the loan terms?

4 A.   Victim No. 2 said that the amount was just going to be

5 for the interest.   The total had been bumped up from 3700 --

6 $2700 to $3700 and eventually $5,000.

7 Q.   And once the mention of 5,000 --

8      Who brought up the idea of $5,000?

9 A.   John Calabrese.

10 Q.   And what did Mr. Calabrese say was going to happen if

11 Victim Two agreed to the $5,000 repayment?

12 A.   He told him that the debt would be clear if he paid

13 that full amount.

14 Q.   Clear meaning no more *juice* payments?

15 A.   No more *juice* payments.   That the money -- the $200

16 every other week would come directly off the principal of

17 the loan or the debt.

18 Q.   At some point did Victim No. 2 stop making those

19 payments?

20 A.   Yes.

21 Q.   Was it around that time that Victim No. 2 came to law

22 enforcement?

23 A.   Yes, he did.

24 Q.   And in your discussion --

25      In law enforcement's discussion with Victim No. 2, did

02497

1  Victim No. 2 explain why he was coming to law enforcement

2  for assistance?

3  A.   Yes, he did.

4  Q.   What was the explanation that Victim No. 2 told law

5  enforcement as to why he was coming to them?

6  A.   Victim No. 2 not only said he could no longer pay the

7  $200 every other week because he wasn't currently employed

8  at that time; he also said he feared for the life -- his

9  life and his father's life.

10 Q.   Why --

11 A.   Feared for his safety.

12 Q.   Why was he concerned --

13      Why did he fear for his life and his father's life?

14 A.   Well, he feared --

15           THE COURT:  Yeah, what did he say about why.

16 Q.   What did he say as to why he was in fear for his

17 father's life specifically?

18 A.   He said that Gerald Daniele's a violent man, and he had

19 safety concerns.

20 Q.   Did law enforcement work with Victim No. 2 to make the

21 payments as arranged?

22 A.   Yes, we did.

23 Q.   Who would Victim No. 2 make the payments to?

24 A.   John Calabrese.

25 Q.   As it relates to the collection, where would these

02498

1 collections take place?

2 A.   Most of the collections took place at the Springfield

3 YMCA.

4 Q.   During these collections, how would Mr. Calabrese

5 arrive to make the payment -- or to make the collection of

6 the payment?

7 A.   Mr. Calabrese would arrive in his Braman Pesticide work

8 truck.

9 Q.   Is this the same truck or at least the same company

10 that he used to collect the loans from Victim No. 1?

11 A.   Yes, it is.

12 Q.   And were these meetings of video -- were they -- was

13 there surveillance done of these meetings?

14 A.   Yes, there was.

15 Q.   Were they video recorded?

16 A.   Not always.

17 Q.   Were they audio recorded?

18 A.   Yes, they were.

19 Q.   Were different devices utilized between Victim One and

20 Victim Two?

21 A.   Yes, they were.

22 Q.   In or about November of 2015 was a decision made by law

23 enforcement to stop paying Mr. Calabrese?

24 A.   Yes.

25 Q.   And up until that time had Victim No. 2 expressed

1 issues making these payments as part of a way to get out of

2 making the payments to them?

3  That was a horrible question.  Let me go back.

4 A. Can you repeat the question?

5 Q. Up until that time had there been discussions about

6 Victim No. 2's inability to pay?

7 A. Yes.

8 Q. Did anyone assist Mr. Calabrese in those collections or

9 coming up with ideas?

10 A. Yes.

11 Q. Who was that?

12 A. Ralph Santaniello.

13 Q. On how many occasions was Mr. --

14   MR. KELLY:  Objection.

15   THE COURT:  Yeah.

16   MR. KELLY:  I didn't hear the basis of that, Your

17 Honor.

18   THE COURT:  Yeah.  Okay.  Let's back up a little

19 bit.  I think the line of questioning is not entirely clear

20 to me.  The notion of a problem.  I'm not quite sure where

21 this is coming from, who's saying what and exactly.  So

22 let's clarify a little bit.  Thanks.

23 BY MS. SHELVEY:

24 Q. How many payments did Victim No. 2 working in concert

25 with law enforcement make on this loan?

02500

Zanolli - Direct by Shelvey

77

1  A.   Victim No. 2 made a total of six payments, each $200,

2  for a total of $1200.

3  Q.   During all six of those payments were there discussions

4  between Victim Two and individuals about the ability to make

5  -- continue making these payments?

6  A.   Yes, there was.

7  Q.   What was the nature of those discussions?  First as it

8  relates to John Calabrese.

9  A.   Can you rephrase the question?

10 Q.   As it relates to his discussions, Victim Two's

11 relationship or discussions with John Calabrese about his

12 inability to pay, what types of things would he say?

13 A.   John Calabrese would tell him that he has to pay

14 basically no matter what.  Victim No. 2 had concerns.  His

15 concerns to John Calabrese were that he did not have a

16 steady job at times, and John Calabrese told him you got to

17 -- you have to pay no matter what.

18 Q.   Were there two separate occasions where it was not just

19 John Calabrese who came to collect the moneys?

20 A.   Yes, there were two occasions.

21 Q.   Specifically, I want to direct your attention to an

22 August 24th of 2015 incident.

23      Was Victim No. 2 arranged to make a payment of $200 to

24 John Calabrese?

25 A.   Yes, that's correct.

02501

Zanolli - Direct by Shelvey

78

1  Q.   And where did that incident take place?  Was supposed

2  to take place, the payment.

3  A.   That payment was supposed to take place at the YMCA in

4  Springfield.

5  Q.   Did it change at the last minute?

6  A.   Yes, it did.

7  Q.   Can you describe that, please?

8  A.   John Calabrese had contacted Victim No. 2 via phone and

9  told him to meet him at Bertucci's in Longmeadow,

10  Massachusetts.

11  Q.   Was law enforcement then able to reset up and surveil

12  this meeting?

13  A.   From a distance, yes.

14  Q.   Who did law enforcement and Victim No. 2 believe based

15  on the conversation was going to be there?

16  A.   We believed that it was going to be Victim No. 2 and

17  John Calabrese.

18  Q.   When Victim No. 2 arrived at Bertucci's, was Mr.

19  Calabrese there?

20  A.   Yes, he was.

21  Q.   Was anybody else there with him?

22  A.   Yes.  Ralph Santaniello was present, as well.

23  Q.   Did that surprise law enforcement?

24  A.   Yes, it did.

25  Q.   During that discussion was there some issues raised

02502

Zanolli - Direct by Shelvey

79

1  about Victim No. 2's inability to continue making payments?

2  A.   Yes.

3  Q.   Can you describe a little bit about that interaction,

4  please?

5  A.   Victim No. 2 told them that he no longer had the money

6  to make payments to them.

7  Q.   And what was reaction of John Calabrese and Ralph

8  Santaniello?

9  A.   The same reaction they had in prior meetings; whether

10  he was employed or not, that he still had to make payments.

11  Q.   Was there discussions about alternative methods or ways

12  to make money?

13  A.   Yes, there was.

14  Q.   And what were those?

15  A.   They stated that he could sell narcotics to make money

16  to repay his debt.   Another --

17  Q.   I want to stop.

18      Who suggested that Victim No. 2 sell narcotics to make

19  money to repay the debt?

20  A.   That was Ralph Santaniello.

21  Q.   Continue, please.   I'm sorry.

22  A.   Yes.   That was Ralph Santaniello.

23      John Calabrese had suggested that he bring more betters

24  to the table, names that they could review -- him and Ralph

25  could review and vet out to ensure that they were not law

02503

1  enforcement.  And that way he could get a certain percentage

2  or a kickback from these betters when they lost with them to

3  repay his debt with them.

4  Q.   And now, between August 24 and October 6 were there two

5  additional payments of $200 made?

6  A.   Yes, there were.

7  Q.   And who were those payments made to?

8  A.   John Calabrese.

9  Q.   I want to direct your attention to a payment on October

10 20th of 2015.

11      Was a $200 payment arranged?

12 A.   Yes.

13 Q.   Who was the payment to be made to?

14 A.   John Calabrese.

15 Q.   Where was this payment to occur?

16 A.   The YMCA.

17 Q.   And did someone other than or in addition to John

18 Calabrese arrive at that one?

19 A.   Yes.

20 Q.   And who was that?

21 A.   That was Ralph Santaniello.

22 Q.   During that meeting did Victim No. 2 indicate he could

23 pay no more?

24 A.   Yes, he did.

25 Q.   Can you describe that discussion, please?

02504

Zanolli - Direct by Shelvey

1  A.   I don't recall the details.  I do recall that he did

2  tell him that he no longer had employment and was unable to

3  make payments.

4  Q.   And was there any discussion in that conversation about

5  again coming up with betters that they could utilize?

6  A.   Yes.

7  Q.   Did anyone indicate that they would be able to provide

8  Victim No. 2 with tools of the betting trade, if you will?

9  A.   I don't recall.

10 Q.   After October of 2015 were there any further payments

11 made to Mr. Calabrese or Mr. Santaniello?

12 A.   Yes, there was one additional payment.

13 Q.   When was that?

14 A.   That was July 8th of this year.

15 Q.   Now, between November of 2015 and July of 2016 was

16 Victim No. 2 in contact with Mr. Calabrese?

17 A.   Yes, he was.

18 Q.   And can you describe a little bit about how many times

19 the contact occurred?

20 A.   I know there were several contacts, and they were

21 mostly in the context of meeting him at AA meetings.

22 Q.   Why would they meet at AA meetings?  Why did he want to

23 meet there?

24 A.   The Victim No. 2 is a recovering alcoholic, so he still

25 attended alcohol AA meetings, and Mr. Calabrese was also a

82

1  recovering alcoholic, and he would attend those meetings, as

2  well.

3  Q.    And when he attended -- when they were in the same

4  place, was the discussion just about their recovery?

5  A.    No, it wasn't.  No, it was not.

6  Q.    What did Victim Two tell you about his interaction with

7  Mr. Calabrese?

8  A.    Interaction was Mr. Calabrese had asked him how he was

9  doing.  Victim No. 2 had stated that everything was good,

10 and that he currently was employed.

11 Q.    And hearing that Victim No. 2 was currently employed,

12 what did Mr. Calabrese do?

13 A.    Mr. Calabrese arranged over a conversation, text

14 messages and telephone, to have a meeting with Victim No. 2

15 to make additional payments.

16 Q.    And in July 2016, on July 8th of 2016, did a payment

17 occur?

18 A.    Yes, it did.

19 Q.    Can you describe that, please?

20 A.    Yes.  Victim No. 2 met with John Calabrese at the YMCA

21 in Springfield as they had before.  A payment of $100 was

22 made directly to Mr. Calabrese.

23 Q.    And what vehicle was Mr. Calabrese driving at that last

24 meeting in July of 2016?

25 A.    Mr. Calabrese was driving his work truck, the Braman

02506

Zanolli - Direct by Shelvey

83

1  Chemical truck, as he had before.

2  Q.    During the course of this investigation did you have

3  the opportunity to review the criminal histories of these

4  five individuals?

5  A.    Yes, I have.

6  Q.    And now, as it relates, first, to Ralph Santaniello,

7  did you review his criminal history?

8  A.    Yes, I have.

9  Q.    Did you make a request by law enforcement to get some

10  of the police reports in the indictments of his previous

11  crimes?

12  A.    Yes, I have.

13        MR. SHELVEY:   May I approach?

14        THE COURT:   Yes.

15  Q.    I'm going to show you what's been marked Government's

16  Exhibit No. 10, 11 and 12 and ask you if you can identify

17  that.

18        MR. SHELVEY:   Your Honor, Counsel for Mr.

19  Santaniello have copies these.

20  A.    Yes.  Exhibit 10 is an arrest report for Ralph

21  Santaniello.

22  Q.    And all of these Exhibits, 10, 11, and 12, are those

23  reports that correspond to charges (inaudible)?

24  A.    Of Mr. Santaniello, yes, correct.  The first report --

25  Q.    Is it safe to say those are older reports?

02507

1 A.    Yes, they are.

2          MR. SHELVEY:  I move to admit them.

3          THE COURT:  All right.  Those are exhibits --

4          MR. SHELVEY:  10, 11 and 12.

5          THE COURT:  Okay.

6          MR. SHELVEY:  With regard to Mr. Santaniello.

7          THE COURT:  At the.

8      GOVERNMENT EXHIBIT NO. 10, 11, 12, ADMITTED

9 Q.    And in similar fashion did you have the opportunity to

10 request a police report as it relates to Mr. Gerald Daniele?

11 A.    Yes.

12 Q.    Again, I'm going to show you what's been marked

13 Government's Exhibit 9 and ask you if you recognize that?

14 A.    Yes, I do.

15 Q.    Does that correspond to one of the incidents on Mr.

16 Daniele's report?

17 A.    Yes, it does.  Yes, it does.

18          MR. SHELVEY:  Your Honor, I'd move to admit this

19 as Government's Exhibit 9.

20          THE COURT:  Any objection, Mr. Entin?  No?  That

21 will be exhibit -- that will be admitted.

22      GOVERNMENT EXHIBIT NO. 9, ADMITTED

23 BY MS. SHELVEY:

24 Q.    And as it relates to Mr. Calabrese, did you have the

25 opportunity to review his criminal history?

*Judy Bond*
**Certified Federal Court Transcriber**
**508.984.7003**

02508

Zanolli - Direct by Shelvey

1  A.   Yes, I did.

2  Q.   And as part of this investigation, did law enforcement

3  make requests of other agencies for copies of those reports,

4  as well?

5  A.   Yes, we did.

6  Q.   I'm going to show you what's been marked as Exhibit 13,

7  and ask if you if you recognize it?

8  A.   Yes, I do.

9  Q.   What do you recognize that to be?

10 A.   This is a police report.  The defendant is Giovanni

11 Calabrese.

12 Q.   The individual we've been referring to as John

13 Calabrese?

14 A.   Yes, correct.

15       MR. SHELVEY:  Your Honor, I'd ask this be admitted

16 in evidence.

17       THE COURT:  Objection, Mr. Powers?

18       MR. POWERS:  (Inaudible.)

19       THE COURT:  Thank you.

20    GOVERNMENT EXHIBIT NO. 13, ADMITTED

21       MR. SHELVEY:  Can I just have a moment?

22 Q.   During the course of this investigation in

23 Massachusetts, were you aware of a parallel investigation

24 going on in New York City?

25 A.   Yes, I was.

Zanolli - Direct by Shelvey

1 Q.   Was law enforcement, FBI in Springfield, working with

2 law enforcement in the Southern District of New York?

3 A.   Yes, we were.

4 Q.   Were two of the subjects --

5     As it relates to this case, who were the subjects of

6 the New York investigation?

7 A.   The two subjects related to the New York investigation

8 are Ralph Santaniello and Frank Depergola.

9 Q.   Can you tell the Court a little bit about their

10 involvement in the New York indictment?

11 A.   Yes.  Briefly, Ralph Santaniello and Frank Depergola's

12 involvement was that they provided members of Genovese crime

13 family from New York with a loan in the amount of $30,000.

14 This loan was provided to Eugene Onofrio, *a/k/a* the *Rooster*,

15 who was an acting Capo with the Genovese crime family in New

16 York City who operates the New York City, Connecticut, and

17 Massachusetts.

18 Q.   So they're involved --

19     And it's a RICO conspiracy charge?

20 A.   It is.

21 Q.   And they were alleged, based on this indictment, to

22 have funded a street loan?

23 A.   Yes, that's correct.

24 Q.   And how much?

25 A.   In the amount of $30,000.

1 Q.   And who did they provide that money to?

2 A.   That money was provided to Eugene Onofrio.

3 Q.   And that was, you mentioned, the acting Capo?

4 A.   He is an acting Capo with the Genovese crime family in

5 New York City, correct.

6 Q.   Is that the same acting Capo that's responsible for

7 overseeing the western district -- excuse me -- the Western

8 Massachusetts Area, specifically Springfield?

9 A.   Yes.  He is possibly for Western Massachusetts, as well

10 as other areas.

11 Q.   Now, as it relates to this street loan, this $30,000

12 loan, were there any weekly interest rate or points that

13 were associated with it?

14 A.   Yes, there was.

15 Q.   And what was the annual interest rate as it related to

16 this loan?

17 A.   I believe it was 1.5 points.

18 Q.   1.5 points, so that's per week?

19 A.   Yes, correct.

20 Q.   What did that then result in an annual interest rate?

21 Do you remember?

22 A.   Approximately 78 percent interest rate.

23 Q.   Thank you.

24      Now, this transaction where Mr. Santaniello and Mr.

25 Depergola provided the $30,000 to Mr. Onofrio, where did

02511

Zanolli - Direct by Shelvey

88

1 that occur?

2 A.    That occurred in Chicopee, Massachusetts, at Johnny's

3 Pizzeria.

4 Q.    And did members of law enforcement involved in the case

5 that we're talking about today, were they involved in the

6 surveillance of that transaction?

7 A.    Yes, they were.

8 Q.    Did they verify that Mr. Onofrio was, in fact, present?

9 A.    We did.

10 Q.    And that Mr. Depergola and Mr. Santaniello were also

11 present?

12 A.    Yes, we did.

13 Q.    Now, how did law enforcement come to learn about the

14 $30,000 street loan?

15 A.    We were contacted by the New York Division of the FBI

16 who provided us information that there was a meeting that

17 was going to take place in the Springfield Metropolitan

18 area.

19 Q.    And was the FBI utilizing an undercover agent who was

20 involved with this loan and these transactions?

21 A.    Yes.

22 Q.    Was also a source?

23 A.    Yes, correct.

24 Q.    Again, did law enforcement here in the Springfield

25 area, in Chicopee, were they able to ascertain and verify

02512

1  that there was another individual present that law

2  enforcement identified as their cooperating individual?

3  A.   Yes, correct.

4           MR. SHELVEY:  May I have a moment, Your Honor?

5           THE COURT:  Yes.

6           MR. SHELVEY:  I think that's all for the

7  government, Your Honor.

8       (Direct examination concluded at 5:07:58 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

02513

90

1                         CERTIFICATION

2       I, Judy Bond Gonsalves, a court approved transcriber,

3   certify that the foregoing is a correct transcript from the

4   official electronic sound recording of the proceedings in

5   the above-entitled matter.

6

7

8   _____        November 1, 2016
    Judy Bond

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              *Judy Bond*
               **Certified Federal Court Transcriber**
                          **508.984.7003**

02514